ALASKA INTERSTATE CONSTRUC-
TION, LLC, Peak Alaska Ventures, Inc.
and Nabors Alaska Services Corpora-
tion, Appellants/Cross–Appellees,

v.

PACIFIC DIVERSIFIED INVEST-
MENTS, INC., John Ellsworth, Individu-
ally, and Anchorage Aviation Center,
LLC, Appellees/Cross–Appellants.

Nos. S–13478, S–13667.

Supreme Court of Alaska.

Feb. 10, 2012.

Timothy J. Petumenos, Birch Horton Bittner & Cherot, Anchorage, for Appellants, Cross–Appellees Alaska Interstate Construction, LLC, Peak Alaska Ventures, Inc., and Nabors Alaska Services Corporation.

Jahna M. Lindemuth, Dorsey & Whitney LLP, Anchorage, for Appellant and Cross–Appellee, Peak Alaska Ventures, Inc.

Peter J. Maassen, Ingaldson, Maassen & Fitzgerald, P.C., Anchorage, for Appellees and Cross–Appellants, Pacific Diversified Investments, Inc., John Ellsworth, Individually, and Anchorage Aviation Center, LLC.

Before: CARPENETI, Chief Justice, FABE, CHRISTEN, and STOWERS, Justices.

*OPINION*

CHRISTEN, Justice.

## I. INTRODUCTION

Alaska Interstate Construction, LLC, is a general contractor involved in the construction of roads, bridges, and dams; it also supplies support services to the oilfield sector. In 1995, Alaska Interstate Construction's assets were sold to a joint venture but it continued to be operated by its founder, John Ellsworth, through a company he owned called Pacific Diversified Investments, Inc. In 1998, Alaska Interstate Construction conveyed a 20% ownership interest to Ellsworth and entered into an operating agreement that provided for Ellsworth's continued management of Alaska Interstate Construction's operations through Pacific Diversified Investments.

Starting in 1998, Pacific Diversified Investments also leased two aircraft to Alaska Interstate Construction and provided aircraft support services for them.

Alaska Interstate Construction filed suit against Pacific Diversified Investments and Ellsworth in 2005, principally alleging fraud, breach of the covenant of good faith and fair dealing, violation of the Unfair Trade Practices Act, breach of the parties' operating agreement, and conversion. The jury returned a verdict of $7.3 million in favor of Alaska Interstate Construction on its Unfair Trade Practices Act claims and $7.3 million on its claims for common law fraud and breach of fiduciary duty. The parties filed many post-trial motions.

Though the jury decided that Pacific Diversified Investments and Ellsworth engaged in conduct that was fraudulent, it decided that they did not materially breach the parties' operating agreement. Alaska Interstate Construction filed a post-verdict motion for judgment notwithstanding the verdict arguing the jury's finding of fraud required the finding that the operating agreement was materially breached. This motion was denied.

But the superior court did enter judgment notwithstanding the verdict nullifying the $7.3 million award for violations of the Unfair Trade Practices Act. This ruling was prem-

ised on the superior court's conclusion that the conduct the jury found to be fraudulent was exempt from the Unfair Trade Practices Act because it dealt with aviation, an industry regulated by the Federal Aviation Administration.

The superior court awarded attorney's fees and costs to Pacific Diversified Investments and Ellsworth.

Alaska Interstate Construction appeals; Pacific Diversified Investments and Ellsworth cross-appeal.

We affirm the superior court's denial of the motion for judgment notwithstanding the verdict seeking a ruling that the Unfair Trade Practices Act does not apply to intra-corporate disputes. We affirm the superior court's determination that Alaska Interstate Construction's aircraft lease claims were not barred by the statute of limitations. We affirm the superior court's decision to deny Pacific Diversified Investments access to discovery in support of its abuse of process claim. We also affirm the superior court's decision to apply the clear and convincing evidence standard of proof to the quasi-estoppel defense.

We reverse the superior court's judgment notwithstanding the verdict on Pacific Diversified Investments's argument that Alaska Interstate Construction's claims were exempt from the Unfair Trade Practices Act. We reverse the superior court's ruling on material breach and hold that the jury's findings of fraud and wilful misconduct, under the circumstances of this case, required the finding that Pacific Diversified Investments materially breached the operating agreement as a matter of law. We reverse the superior court's order denying the motion for judgment notwithstanding the verdict on Pacific Diversified Investments's fraud in the inducement claim, and we vacate the superior court's determination of prevailing party, award of attorney's fees, and award of prejudgment interest.

In light of these rulings, Pacific Diversified Investments's claims of statutory and contractual indemnity are moot.

## II. FACTS AND PROCEEDINGS

In 1987 John Ellsworth started Alaska Interstate Construction, LLC (AIC). AIC is a general contractor involved in the construction of roads, bridges, and dams. It also supplies other oilfield-related support services. In 1995, Ellsworth sold AIC's assets to a joint venture consisting of Nabors Alaska Services Corp., a subsidiary of Nabors Industries, Inc. (Nabors), and Peak Alaska Ventures, Inc. (Peak), a subsidiary of Cook Inlet Region, Inc. (CIRI). The joint venture retained Ellsworth to manage AIC under a three-year consulting contract. Ellsworth managed AIC through Pacific Diversified Investments, Inc. (PDI), a company he owned.[1] The management contract between AIC and PDI contained a non-compete clause naming PDI and Ellsworth in his personal capacity.

In 1998, with PDI's management contract about to expire, Carl Marrs, then president of CIRI and Peak, suggested offering Ellsworth an ownership interest in AIC to keep him engaged in the company. Marrs convinced Ellsworth to convert a forthcoming bonus into a 20% ownership interest in AIC. He and Ellsworth negotiated "some of the key business terms" between themselves. Ellsworth also negotiated terms with Mark Kroloff, an attorney who acted on behalf of CIRI and Peak; Keith Sanders, who was then CIRI's general counsel; Charlie Cole, PDI and Ellsworth's lawyer; and Kathy Ellis, in-house counsel for Nabors. The operating agreement gave Ellsworth an ownership interest in AIC and responsibility for managing AIC.

The parties' operating agreement included a non-compete clause paralleling the three-year management agreement the parties had entered into in 1995. By its terms, the non-compete clause applied to Ellsworth personally and to PDI.

---

1. Throughout this opinion, we use "PDI" to refer to Pacific Diversified Investments and John Ellsworth, except for instances when it is necessary to distinguish between them. We also use "AIC" to refer to all cross-appellees collectively, except where it is necessary to distinguish Peak or Nabors.

PDI continued to manage AIC from 1998 through April 30, 2005. During this period, the ownership of AIC was split: Peak owned 40%; Nabors owned 40%; and PDI owned 20%.

Later, PDI leased two aircraft to AIC and contractually agreed to provide aircraft support services for them. The first lease was the October 1, 1998 Letter Agreement. The second was the Sakhalin Jet Lease.[2] AIC paid over $20 million to PDI under these two leases.

In 2005, the other owners of AIC decided to change its management. They purchased PDI's 20% ownership interest and assumed management responsibility.

AIC filed suit against PDI in May 2005 claiming conversion, breach of the covenant of good faith and fair dealing, and breach of the parties' operating agreement. AIC filed an amended complaint in September 2006 adding claims of fraud and violation of the Unfair Trade Practices Act (UTPA). PDI responded with more than twenty counterclaims, many of which were dismissed before trial. The relevant counter-claims on appeal to our court are Ellsworth's claim that he was fraudulently induced to enter the operating agreement containing the non-compete clause, PDI's claim that AIC abused the judicial process by reporting its suspicions of fraud to the FBI and the U.S. Attorney's Office, and the claim that AIC breached the operating agreement by not paying the contractual premium price of $12 million for PDI's ownership interest in AIC. Before trial, PDI conceded over-billing AIC by $1,902,827.

The evidence at trial established that the October 1, 1998 Letter Agreement, signed by Peak and Nabors, called for PDI to provide aircraft services to AIC at $1,467 per flight hour. In 2002, PDI began charging monthly fees of $100,000 to AIC for the use of one aircraft, regardless of the time the aircraft was used by AIC. AIC introduced evidence showing that neither Peak nor Nabors gave prior approval for this change. AIC's forensics auditor, FTI Consulting, ultimately concluded that the October 1, 1998 Letter Agreement resulted in approximately $6 million in overpayments.

The Sakhalin Jet Lease required AIC to pay $125,000 per month for use of a jet.[3] AIC claimed damages for payments made on this lease in excess of arms-length, fair market compensation. FTI opined that $9.8 million of the $12.5 million AIC paid to PDI for services under the Sakhalin Jet Lease were overpayments, based on a rate of $5,000 per flight hour for 552.5 hours of business use.

In all, FTI's testimony was that approximately $17 million of the payments made pursuant to the aircraft leases was billed at a rate that exceeded market value, billed for services not received, or was otherwise fraudulent.[4] AIC also presented evidence of improper or fraudulent credit card charges and charges for expenses unrelated to AIC's business, and AIC alleged that some of its assets were sold at below market value after AIC gave notice that it would no longer use PDI to manage its operations.

PDI argued at trial that AIC should be estopped from enforcing the parties' operating agreement because it was modified by the parties' "words and conduct" and it would be unconscionable to enforce it. PDI also

2. The lease agreements were made with Anchorage Aviation Center, LLC (AAC), a wholly-owned subsidiary of PDI through which PDI provided aircraft services. The parties stipulated that PDI and AAC can be treated as a single entity in this litigation.

3. While Ellsworth managed AIC, it formed SakhalinMorNefteMontazh Alaska Projects, LLC (SAP), a wholly-owned subsidiary of AIC, to lease aircraft. The parties stipulated to treating AIC and SAP as the same entity.

4. FTI determined that there were $17,172,728 in total aircraft related damages. He made this determination using the following breakdown: PDI gain on sale of Gulfstream III s/n 466: $936,103; other aircraft-related damages: $474,379; flight hours invoiced, but not flown: $1,412,139; undocumented use of Westwind II s/n 436: $60,294; non-reimbursable expenses billed by PDI: $1,571,767. To this, FTI added non-business or undocumented use of an Astra SP s/n 062 and Astra SPX s/n 121: $1,362,990; billing in excess of $1,467 per hour due to rate change: $916,767; non-business or undocumented use of Gulfstream III jet s/n 437: $608,805; and AAC–SMAK Gulfstream III jet lease damages: $9,829,484.

argued that any misconduct or errors in billing did not materially breach the operating agreement because the objective of the operating agreement was to make a profit and AIC was profitable during the period PDI managed it. PDI argued that its conduct was exempt from the Unfair Trade Practices Act (UTPA) because the parties were not in competition, because the leases did not meet the Act's definition of "goods and services," and because the Act does not apply to intra-corporate disputes. As explained, Ellsworth argued that he was fraudulently induced into signing the operating agreement containing the non-compete clause. Contrary to the express language of the non-compete agreement, Marrs and Ellsworth both testified that they did not intend for it to cover Ellsworth personally.

The jury found that PDI committed unfair and deceptive acts under the UTPA related to the aircraft leases and that this conduct caused more than $7.3 million in damages to AIC. The jury awarded the same amount, $7.3 million, on AIC's claims of fraud by non-disclosure, fraud by affirmative misrepresentation, conversion, breach of fiduciary duty, and breach of the covenant of good faith and fair dealing relating to the aircraft leases. The jury also awarded $350,000 for conversion and breach of fiduciary duty arising from improper credit card billings; approximately $23,000 for payments of expenses unrelated to AIC's business, and approximately $85,000 for breach of fiduciary duty and breach of the covenant of good faith and fair dealing related to improper sales of assets at below market value after PDI received notice that it was being removed as manager of AIC. The jury decided that Ellsworth was personally bound by the non-compete provision in the operating agreement, but it also decided that he was fraudulently induced into entering into the operating agreement containing the non-compete provision.

Despite its findings of fraudulent conduct by PDI, the jury decided that PDI did not

materially breach the operating agreement and that Peak and Nabors were not excused from their contractual obligations.[5] The jury awarded PDI $12 million under two of the operating agreement's provisions. One required payment of a premium price for PDI's ownership interest in AIC. The other required payment of incentive compensation for PDI's 2005 management services.

In post-trial motion practice, the superior court ruled that AIC's aircraft-related claims were exempt from the UTPA. The superior court granted judgment notwithstanding the jury's verdict (JNOV) to PDI, overturning the jury's verdict on the UTPA claims and denying AIC's motion for treble damages. The superior court denied the motion for JNOV that Peak and Nabors filed in which they argued that the jury's findings of fraud, bad faith, and wilful misconduct established that PDI materially breached the operating agreement as a matter of law. The superior court upheld the $12 million award in favor of PDI. Later, PDI was determined to be the prevailing party and awarded attorney's fees and costs.

Both AIC and PDI appeal.

## III. STANDARD OF REVIEW

■ In reviewing orders granting or denying JNOV motions, we must "determine whether the evidence, when viewed in the light most favorable to the non-moving party, is such that reasonable persons could not differ in their judgment of the facts."[6] In addition, "[t]o the extent that a ruling on a motion for [JNOV] involves questions of law, those questions will be reviewed de novo."[7]

■ A superior court's finding that an issue has been tried by consent, or that it was raised in a motion for directed verdict, is reviewed for abuse of discretion.[8]

■ The superior court's determination of when a statute of limitations begins to run is

---

**5.** The jury also found that PDI's breach of the covenant not to compete was not a material breach of the operating agreement.

**6.** *Richey v. Oen,* 824 P.2d 1371, 1374 (Alaska 1992).

**7.** *Sisters of Providence in Wash. v. A.A. Pain Clinic, Inc.,* 81 P.3d 989, 999 n. 10 (Alaska 2003).

**8.** *Tufco, Inc. v. Pac. Envtl. Corp.,* 113 P.3d 668, 673–74 (Alaska 2005).

a question of fact [9] that we review under the clearly erroneous standard.[10]

■ Discovery orders are reviewed under the "deferential abuse of discretion standard." [11] We apply our independent judgment to determine whether a challenged jury instruction states the law correctly.[12] Errors in jury instructions are not grounds for reversal unless the errors are prejudicial.[13]

## IV. DISCUSSION

### A. The Superior Court Erred By Granting PDI's Motion For JNOV On The Applicability Of The UTPA To Aircraft Leases.

■ Alaska's UTPA provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce are declared unlawful." [14] The UTPA broadly prohibits unfair competition and fraudulent conduct pertaining to the sale of "goods or services" in "consumer transactions." [15] In addition to enforcement by the state attorney general, the UTPA provides a private right of action by any "person who suffers an ascertainable loss of money or property as a result of another person's act or practice declared unlawful [under the UTPA]." [16] Two elements must be proven to establish a prima facie case of unfair or deceptive acts or practices: "(1) that the defendant is engaged in trade or commerce; and (2) that in the conduct of trade or commerce, an unfair act or practice has occurred." [17] The engaged-in-commerce prong encompasses both consumer and business-to-business transactions.[18]

Alaska Statute 45.50.481 carves out three exemptions from the UTPA. The pertinent exemption relating to conduct regulated by other statutory schemes appears in AS 45.50.481(a)(1):

> Nothing in [the UTPA] applies to ... an act or transaction regulated under laws administered by the state, by a regulatory board or commission except as provided by AS 45.50.471(b)(27) and (30), or officer acting under statutory authority of the state or of the United States, unless the law regulating the act or transaction does not prohibit the practices declared unlawful in AS 45.50.471.

We have said that the UTPA exemption only applies where a "separate and distinct statutory scheme" regulates acts and practices, and the acts or practices "are therein prohibited." [19]

The jury returned a verdict of $7.3 million in favor of AIC on its UTPA claims, but the superior court vacated that award by granting PDI's motion for JNOV. On appeal, AIC first argues that PDI should not have been permitted to argue that its conduct falls under the subsection of the UTPA exempting conduct regulated by other laws because this argument was raised for the first time after the jury had been discharged. In response, PDI argues that the superior court did not abuse its discretion when it ruled that the exemption issue was tried by consent and that AIC was on notice that "there were many regulations concerning aircraft leasing."

### 1. PDI's UTPA exemption defense was impermissibly raised for the first time in its motion for JNOV.

■ The record shows that PDI's amended answer did not include an affirmative

**9.** *Solomon v. Interior Hous. Auth.*, 140 P.3d 882, 883 (Alaska 2006).

**10.** *Williams v. Williams*, 129 P.3d 428, 431 (Alaska 2006) (citing *John's Heating Serv. v. Lamb*, 46 P.3d 1024, 1033 n. 28 (Alaska 2002)).

**11.** *In re Mendel*, 897 P.2d 68, 72 n. 7 (Alaska 1995).

**12.** *City of Kodiak v. Samaniego*, 83 P.3d 1077, 1082 (Alaska 2004).

**13.** *State v. Carpenter*, 171 P.3d 41, 54 (Alaska 2007).

**14.** AS 45.50.471(a).

**15.** AS 45.50.471(b).

**16.** AS 45.50.531(a).

**17.** *Odom v. Fairbanks Mem'l Hosp.*, 999 P.2d 123, 132 (Alaska 2000) (quoting *State v. O'Neill Investigations, Inc.*, 609 P.2d 520, 534 (Alaska 1980)).

**18.** *W. Star Trucks, Inc. v. Big Iron Equip. Serv., Inc.*, 101 P.3d 1047, 1048–49 (Alaska 2004).

**19.** *O'Neill Investigations, Inc.*, 609 P.2d at 528.

defense arguing that its conduct was exempt from the UTPA; PDI's answer made no mention of "exemptions" at all. But the superior court ruled that the exemption issue was properly raised. The superior court initially determined, "[i]n reviewing the directed verdict motion in this case, this court finds that the UTPA issues were properly raised, and the [motion for JNOV] is properly before this court." In an order on motion for partial reconsideration, the superior court appears to have determined that the UTPA exemption claims were tried with the express or implied consent of the parties. The order on reconsideration cited Civil Rule 15(b) [20] and *Rollins v. Leibold*.[21] In granting PDI's post-trial motion, the superior court observed, it was "accurate to say that regarding the UTPA, general arguments were raised, rather than the specific arguments detailed here … [n]onetheless, … the issue of the UTPA was raised." The superior court ultimately decided that AIC had been on notice of PDI's exemption argument, reasoning: "[i]t was certainly no secret that there were many regulations concerning aircraft leasing, and it was [AIC] who called an expert in this area."

We recognize that the only aviation expert was the one called by AIC, but the expert did not address whether the Federal Aviation Administration (FAA) specifically regulates the conduct at issue in this case. As discussed more fully below, AIC's expert only expressed an opinion that one of the two aircraft leases violated regulations promulgated by the FAA. This testimony was offered in the context of expressing the ex-

pert's opinion that the second lease was improperly operated under a part of the FAA regulations that covers air transportation generally rather than the part of the regulations that covers the transportation of passengers. The expert explained that operating this way required less paperwork, and allowed PDI's practice of improperly billing AIC to go undetected for an extended period of time.

We do not accept AIC's argument that the superior court erred by using AIC's own expert testimony against it, but our review of the record convinces us that AIC did not ask its expert to address whether the FAA specifically regulates the type of conduct at issue in this case because AIC was not on notice that PDI would argue that the exemption applied until after the jury was discharged.[22] The record shows that AIC was prejudiced by this lack of notice.

■ There is another problem with allowing PDI to advance the UTPA exemption argument for the first time in a motion for JNOV: the rules do not permit new arguments in motions for JNOV. Alaska Rule of Civil Procedure 50 provides that "[a] motion for directed verdict shall state the specific grounds therefor" and if it is denied, "the court is deemed to have submitted the action to the jury subject to a later determination of the legal question raised by the motion."[23] After a verdict is returned, a party who has moved for a directed verdict may move for JNOV to have "judgment entered in accordance with the party's motion for directed

**20.** Civil Rule 15(b) provides:
 When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of

such evidence would prejudice the party in maintaining the party's action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence.

**21.** 512 P.2d 937, 940–41 (Alaska 1973).

**22.** PDI first raised its UTPA exemption defense in its opening memorandum in support of the defendants' post-verdict joint motion for directed verdict on the plaintiffs' claim under the UTPA. Despite being titled as a motion for directed verdict, the superior court treated this post-verdict motion as a motion for JNOV.

**23.** Alaska R. Civ. P. 50(b).

verdict."[24] We have held that the grounds for a JNOV motion must be the same as those raised in a directed verdict motion.[25]

■ At oral argument in the superior court, PDI's position was that the two aircraft leases did not meet the UTPA's definition of "competition" or "goods and services" and that there was no consumer relationship between PDI and AIC. On appeal, PDI characterizes the argument it made in the trial court somewhat differently, arguing its position was that the UTPA only applies to transactions "in the conduct of trade or commerce." In our view, the superior court reasonably understood PDI's primary argument to be that the UTPA applies to consumers, that AIC was not a consumer, and that the leases are not covered under the UTPA because the UTPA applies only to goods and services and a lease is neither a good nor a service. The superior court correctly rejected this argument, citing *Western Star Trucks, Inc. v. Big Iron Equipment Services.*[26]

PDI was allowed to bring its motion for JNOV on the issue of the UTPA exemption because the superior court decided the issue had been raised generally during the trial and generally at the directed verdict level. In reaching this conclusion, the superior court cited *Sisters of Providence in Washington v. A.A. Pain Clinic, Inc.*[27] and *Richey v. Oen.*[28]

PDI argues that the superior court correctly construed PDI's pre-verdict, oral directed verdict motion to encompass the argument it advanced in its post-verdict JNOV motion. It cites *Domke v. Alyeska Pipeline*

*Service Co., Inc.*[29] and *Sisters of Providence in Washington v. A.A. Pain Clinic, Inc.* in support of this argument.[30] In our view, neither case supports PDI's position. Both concern motions for JNOV that encompassed issues contained within the directed verdict motions that preceded them. And, as discussed below, both were limited to unique facts.

In *Domke v. Alyeska Pipeline,* Domke filed a motion for directed verdict on "liability" for its claim that an Alyeska employee tortiously interfered with its contractual relationship.[31] When the directed verdict motion was orally argued, the superior court instructed Domke's lawyer to address whether there were material facts at issue and to focus on whether "Alyeska and [its employee] were justified in their actions."[32] The motion for directed verdict was denied and Domke later moved for JNOV on the issue of Alyeska's vicarious liability for its employee's actions.[33] Alyeska argued that Domke's failure to move for directed verdict on vicarious liability waived its ability to seek a JNOV on the issue.[34] But our court held that "the limited focus of the argument invited by the court … [made it] unrealistic to view Domke's failure to expressly mention vicarious liability as a waiver of the point."[35] We did not hold that a directed verdict motion on "liability" was sufficient to preserve the issue of vicarious liability for JNOV—as argued by PDI—but instead held that the superior court's express limitation of Domke's oral presentation of his motion for JNOV required that the motion be read more broadly. "Under the circumstances, [Domke's] general

**24.** *Id.*

**25.** *See, e.g., Roderer v. Dash,* 233 P.3d 1101, 1108 (Alaska 2010).

**26.** 101 P.3d 1047, 1052 (Alaska 2004) ("the legislative history of the [UTPA] indicates that while consumer protection was the dominant motive underlying the act, the act was not intended to be limited to consumer transactions."). Thus, the UTPA applies to unfair practices in business-to-business transactions as well as business-to-consumer transactions.

**27.** 81 P.3d 989 (Alaska 2003).

**28.** 824 P.2d 1371, 1374 (Alaska 1992) (general directed verdict motion insufficient support for subsequent JNOV).

**29.** 137 P.3d 295, 300 (Alaska 2006).

**30.** 81 P.3d at 1008 n. 63.

**31.** 137 P.3d at 298, 300.

**32.** *Id.* at 300.

**33.** *Id.*

**34.** *Id.*

**35.** *Id.*

motion for a directed verdict establishing Alyeska's liability can best be seen as encompassing all reasonably apparent theories of liability, including the theory that the company was vicariously liable. . . ." [36]

In *Sisters of Providence*, plaintiffs Borello and Chandler sued Providence claiming various types of anti-competitive conduct.[37] Providence unsuccessfully moved for directed verdict on "all damage claims" and then moved for JNOV on damages arising from Chandler's efforts to obtain a temporary restraining order requiring Providence to complete a medical procedure as scheduled, including the fees incurred in that effort.[38] Our court held that the requirement to preserve the damages issue for JNOV was met by Providence's motion for directed verdict on general damages.[39] At best, *Sisters of Providence* represents an instance where a more general directed verdict motion was allowed to serve as the basis for a more specific motion for JNOV encompassed by the pre-verdict motion. *Sisters of Providence* did not permit an entirely new theory to be raised in support of a post-verdict motion seeking to set aside the jury's verdict.

Most recently, in *Roderer v. Dash*, we reiterated that a motion for JNOV "may be entered only 'in accordance with [a previously advanced] motion for directed verdict.' " [40] *Roderer* was a medical malpractice case where the physician's directed verdict motion argued: (1) plaintiff did not present sufficient

evidence to support a finding of "severe permanent physical impairment"; and (2) plaintiff did not present evidence to support a finding that there had been malpractice at more than one vertebral space.[41] But the physician's JNOV motion argued that plaintiff did not present sufficient expert witness testimony on standard of care, breach, or causation.[42] We held that because Roderer's motion for directed verdict did not encompass the issues raised in his motion for JNOV, the superior court correctly denied it.[43]

There are sound reasons for the requirement that motions for JNOV must be preceded by a directed verdict motion on the same issue. A motion for directed verdict at the close of evidence allows litigants to seek rulings on questions of law and to resolve factual issues that are not in dispute. The requirement puts the non-moving party on notice of the moving party's arguments and allows the non-moving party to cure any potential deficiencies of proof so that cases can be decided on their merits.[44] Requiring a motion for directed verdict as a prerequisite to a motion for JNOV respects the jury's fact-finding role.

Here, PDI's oral motion for directed verdict was premised on its argument that its conduct did not violate the UTPA because AIC and PDI were not in competition, because the aircraft leases were not contracts for "goods or services," and because there

36. *Id.*

37. 81 P.3d 989, 995 (Alaska 2003).

38. *Id.* at 1008 n. 63.

39. *Id.* (citing *Metcalf v. Wilbur, Inc.*, 645 P.2d 163, 170 (Alaska 1982)).

40. 233 P.3d 1101, 1108 (Alaska 2010) (quoting Alaska R. Civ. P. 50(b)).

41. *Id.*

42. *Id.*

43. *Id.* See also *Richey v. Oen*, 824 P.2d 1371, 1374 (Alaska 1992), an auto accident case involving a rear-end collision. Plaintiff's motion for directed verdict "on the issue of negligence of the Defendant driver" was granted. When the jury awarded no damages, plaintiff moved for

JNOV arguing that no reasonable jurors could decide that she suffered no damages. We held that the JNOV was improper because plaintiff's directed verdict motion had addressed "negligence," not damages or causation.

44. *See, e.g., McKinnon v. City of Berwyn*, 750 F.2d 1383, 1388 (7th Cir.1984) ("It gives the opposing party a chance to repair—more precisely, to ask the judge for leave to repair—the deficiencies in his proof before it is too late."); *Lowenstein v. Pepsi–Cola Bottling Co.*, 536 F.2d 9, 11 (3d Cir.1976) ("A motion for [JNOV], without prior notice of alleged deficiencies of proof, comes too late for the possibility of cure except by way of a complete new trial."). *See* Fed. R.Civ.P. 50(a)(1) advisory committee's note (1991 amendments) ("In no event . . . should the court enter judgment against a party who has not been apprised of the materiality of the dispositive fact and been afforded an opportunity to present any available evidence bearing on that fact.").

was no consumer relationship between the parties. But because the motion for directed verdict made no mention of the Federal Aviation Regulations (FARs) or exemptions to the UTPA, the motion for JNOV was improper.

## 2. PDI did not establish that its conduct was exempt from the UTPA.

█ PDI also failed to show it was entitled to JNOV on the merits. The superior court ruled that the UTPA claims were exempt under AS 45.50.481(a)(1) because the misconduct AIC alleged in relation to its aircraft leases was regulated by other laws.[45] But the superior court cited the FAA and the FARs generally. The FAA is primarily concerned with aviation safety, not redressing claims of fraudulent billing and conversion.[46] The only specific regulation identified by PDI or the superior court was the truth-in-leasing requirement under FAR Part 91.[47] Part 91 does not address the acts or transactions underlying AIC's UTPA claims—double billing, billing for services not received, unreasonable and allegedly excessive termination fees, or fraudulent charges for upgrading an aircraft entirely unrelated to AIC's business. Part 91's truth-in-leasing provision requires the disclosure of: (1) regulations covering aircraft maintenance; (2) the person responsible for the operational control of the leased aircraft; and (3) the ability to obtain the pertinent operational regulations from the FAA.[48] PDI did not meet its burden of showing the UTPA exemption was applicable to AIC's claims because it did not establish that the FAA specifically regulates the fraudulent conduct AIC alleged in connection with its aircraft leases.

The UTPA exemption only applies where: (1) "the business ... is regulated elsewhere"; and (2) "the unfair acts and practices are therein prohibited."[49] In granting PDI's motion for JNOV, the superior court observed that AIC advanced what became Jury Instruction 19, which explained to the jury that AIC alleged the "Sakahlin jet lease is illegal under the Federal Aviation Regulations." This instruction relates to the testimony of AIC's aviation expert, Delvin Fogg, who testified that PDI operated the second aircraft lease in violation of the FARs because it should have operated under Part 135 rather than Part 91.

The superior court cited Fogg's testimony that operating under Part 91 rather than Part 135 resulted in $12 million of damages.[50] But Fogg testified that operation under Part 135 increases safety regulation and the volume of paperwork that must be kept and filed with the FAA because Part 135 governs commuter and on-demand passenger operations; Part 91 governs aircraft operations generally.[51] Fogg opined that PDI's decision to operate the leased aircraft under Part 91

---

45. AS 45.50.481(a)(1)states:

 Nothing in [the UTPA] applies to ... an act or transaction regulated under laws administered by the state, by a regulatory board or commission except as provided by AS 45.50.471(b)(27) and (30), or officer acting under statutory authority of the state or of the United States, unless the law regulating the act or transaction does not prohibit the practices declared unlawful in AS 45.50.471.

46. 49 U.S.C. § 40101 et seq.; see also Montalvo v. Spirit Airlines, 508 F.3d 464, 468 (9th Cir. 2007) ("The FAA and regulations promulgated pursuant to it establish complete and thorough safety standards for air travel...."); Abdullah v. Am. Airlines, Inc., 181 F.3d 363, 367 (3d Cir. 1999) (holding that the FAA and relevant federal regulations "establish complete and thorough safety standards for interstate and international air transportation").

47. 14 C.F.R. § 91.23 (2011).

48. 14 C.F.R. § 91.23(a).

49. Smallwood v. Cent. Peninsula Gen. Hosp., 151 P.3d 319, 329 (Alaska 2006); State v. O'Neill Investigations, 609 P.2d 520, 528 (Alaska 1980) (UTPA exemption applies where "separate and distinct statutory scheme" regulates acts and practices, and the acts and practices "are therein prohibited."). Accord Pepper v. Routh Crabtree, APC, 219 P.3d 1017, 1023–24 (Alaska 2009); Matanuska Maid, Inc. v. State, 620 P.2d 182, 186 (Alaska 1980).

50. The superior court described Fogg's testimony as establishing a "theme that there are specific regulations applicable to ... aircraft transactions." After reviewing the passages of Fogg's testimony cited by the superior court, it appears these are merely instances where Fogg discusses FAR Parts 91 or 135.

51. See, e.g., 14 C.F.R. § 135.63 (2010) (Record-keeping Requirements).

subjected the lease to a lower level of scrutiny and allowed PDI's fraudulent billing practices to go undetected for a longer period. According to Fogg, if PDI had operated the aircraft under Part 135, as he thought it should have done, the FAA-required paperwork would have resulted in more questions about the transaction and might have resulted in AIC not agreeing to the lease. Fogg testified:

> Well, if you follow the rules like they're supposed to be followed, like I would follow and how I recommend to a client, if you're going to lease an airplane, you need to follow the provisions under [Part] 91.23, fill out the paperwork included in your contracts. When that would have got to Oklahoma City, the [Flight Inspection Safety District Office] in Anchorage would have been advised, someone would have come out and asked: What are you using this airplane for? Well, we're flying freight and billing people for it; but we're flying people that are not employees of AIC or Sakhalin, and we're billing for it. I think at that point—if that was the intention at that point, I think the FAA would have said, well, you might consider getting a Part 135 certificate, because we'll violate you if you start flying that way. So what would have happened in that case, at that point I think a prudent person would have said, well, maybe we shouldn't do this, and we might not be sitting here today.

Fogg did not testify that the FARs comprehensively regulate aircraft leases, or that the FAA specifically prohibits the conduct at issue in this case—he was not asked those questions. Fogg's testimony was that if PDI had operated the leased aircraft under Part 135 rather than Part 91, AIC may not have entered into the lease or PDI's fraudulent billing may have been discovered earlier.

In ruling that the UTPA claims were exempt under AS 45.50.481(a)(1), the superior

court also relied on AIC's argument, in response to a pre-verdict motion to exclude Fogg's testimony, that "violations of FARs committed by Defendants are not *other* bad acts, they *are* the bad acts complained of in this action." But it is important to place AIC's argument in context. Before trial, PDI moved to exclude Fogg's FAR testimony under Evidence Rule 404(b) as impermissible evidence of other bad acts. AIC's statement that violations of FARs committed by defendants "*are* the bad acts complained of" was not an acknowledgment that the aircraft lease may have been specifically regulated by laws other than UTPA. AIC was arguing that Fogg's FAR testimony was relevant to refuting PDI's claim that it should be entitled to indemnity for its defense costs because it was acting as AIC's agent. AIC also argued that Fogg's testimony was relevant to PDI's claim that AIC abused the judicial process by reporting its suspicions that PDI violated the FARs and Internal Revenue Code to the FBI and U.S. Attorney's Office.

PDI also cited the Airline Deregulation Act (ADA) in arguing that its conduct was exempt from the UTPA. The ADA contains a provision similar to the UTPA prohibiting "unfair or deceptive practice[s] or an unfair method of competition ... [by an] air carrier."[52] The superior court rejected this argument because the ADA only applies to "air carriers." Air carriers must be common carriers or carriers of U.S. mail to be covered by the ADA.[53] No one argued that PDI was a "carrier of U.S. mail" and to be an interstate common carrier, PDI would have had to have held itself out to the public as a provider of air transportation services for passengers or property.[54] PDI provided air transport services to AIC, not the general public. It did not establish that it was a common carrier.

PDI did not raise its exemption claim until after the jury was discharged. Even if the

**52.** 49 U.S.C. § 41712(a) (2006).

**53.** 49 U.S.C. § 40102(a)(2) (defining "air carrier" as undertaking "air transportation"); 49 U.S.C. § 40102(a)(25) (defining "interstate air transportation" as "the transportation of passengers or property by aircraft as a common carrier for compensation").

**54.** *United States v. Contract Steel Carriers,* 350 U.S. 409, 410 n. 1, 76 S.Ct. 461, 100 L.Ed. 482 (1956) ("A common carrier is one which holds itself out to the general public to engage in the transportation by motor vehicle of passengers or property.") (internal quotation marks omitted).

argument had been timely raised, PDI did not establish that the FARs specifically regulate the aircraft lease-related conduct complained of in this case: double billing, billing for services not received, unreasonable and excessive termination fees, and fraudulent charges for upgrading an aircraft completely unrelated to AIC business. The superior court correctly ruled that the ADA does not apply to the aircraft leases at issue in this case, but it erred in granting PDI's motion for JNOV on the applicability of UTPA exemptions.

### B. The Superior Court Did Not Err By Denying The Motion For JNOV That Sought A Ruling That The UTPA Does Not Apply to Intra–Corporate Disputes.

▮ PDI argues that an alternative basis for affirming the superior court's ruling is that the UTPA does not apply to intra-corporate disputes. The superior court rejected this argument. We find no error in the superior court's ruling.

▮ The UTPA is a remedial statute.[55] Under the UTPA, a claimant must establish: "(1) that the defendant is engaged in trade or commerce; and (2) that in the conduct of trade or commerce, an unfair act or practice has occurred."[56] We have broadly construed the "engaged-in-commerce" prong to encompass purchases of goods and services in business-to-business commercial transactions as well as in individual consumer transactions.[57]

PDI argues that "[t]ransactions can be either arms-length or fiduciary; they cannot be both" and "[c]ourts uniformly recognize that arms-length and that fiduciary relationships are mutually exclusive." PDI argues that because it was acting as a fiduciary of AIC, it could not have been transacting at arms-length with AIC, and so the UTPA should not apply to transactions between them. In PDI's view, AIC was incorrect to allege that the UTPA applied to the parties' aircraft lease-related dealings because "the UTPA is not designed to be a tool of corporate governance."

PDI cites several cases in support of this position: *Stadt v. Fox News Network LLC*,[58] *Skinner v. Metropolitan Life Insurance Co.*,[59] *OrbusNeich Medical Co. v. Boston Scientific Corp*,[60] *Szalla v. Locke*,[61] and *Schwenk v. Auburn Sportsplex, LLC*.[62] In our view, these cases do not support PDI's contention that corporate relationships are exclusively arms-length or fiduciary. In *Stadt v. Fox News Network LLC*, Fox News obtained an exclusive license agreement from Stadt to use a video.[63] Stadt alleged that Fox News continued to air the video and claimed ownership of it after the licensing agreement with Stadt expired.[64] Stadt brought several claims against Fox News, including a claim for breach of fiduciary duty.[65] The court in that case determined that "the [c]omplaint alleges insufficient facts to establish that Stadt and Fox had a fiduciary relationship, as opposed to a typical, arms-length business relationship."[66] The case does not support PDI's assertion that fiduciary and arms-length relationships are mutually exclusive.

The dispute in *Skinner v. Metropolitan Life Insurance Co.* arose from a life insurance contract.[67] Skinner "entered into a life

**55.** *State v. O'Neill Investigations*, 609 P.2d 520, 528 (Alaska 1980).

**56.** *Odom v. Fairbanks Mem'l Hosp.*, 999 P.2d 123, 132 (Alaska 2000) (quoting *O'Neill*, 609 P.2d at 534).

**57.** *See W. Star Trucks, Inc. v. Big Iron Equip. Serv., Inc.*, 101 P.3d 1047, 1048–49 (Alaska 2004).

**58.** 719 F.Supp.2d 312, 323 (S.D.N.Y.2010).

**59.** 829 F.Supp.2d 669, 681, 2010 WL 2175834, at *11 (N.D.Ind. May 27, 2010).

**60.** 694 F.Supp.2d 106, 116 (D.Mass.2010).

**61.** 421 Mass. 448, 657 N.E.2d 1267, 1268–69 (1995).

**62.** 483 F.Supp.2d 81, 87–88 (D.Mass.2007).

**63.** 719 F.Supp.2d at 316.

**64.** *Id.*

**65.** *Id.*

**66.** *Id.* at 323.

**67.** 829 F.Supp.2d 669, 672, 2010 WL 2175834 at *1 (N.D.Ind. May 27, 2010).

insurance policy which provided that she would no longer need to pay premiums if she became totally disabled."[68] But when Skinner "submitted proof of her total disability, MetLife refused to waive her premiums."[69] Skinner brought claims for breach of contract, bad faith, fraud, and intentional infliction of emotional distress.[70] *Skinner* addressed the relationship between an insurer and its insured and observed, "[t]he Indiana Supreme Court has stated that the contractual relationship between an insurer and an insured is 'at times a traditional arms-length dealing between two parties, as in the initial purchase of a policy, but is also at times one of a fiduciary nature,' and sometimes it is an adversarial relationship."[71] *Skinner* stands for the proposition that the relationship between an insurer and its insured is, in varying circumstances, arms-length, fiduciary, or adversarial; it does not support PDI's argument that the relationship between two corporate entities involved in a joint enterprise cannot be arms-length in some instances, and fiduciary in others.

PDI also relies on *OrbusNeich Medical Co. v. Boston Scientific Corp.*[72] The parties in that case entered into a confidential disclosure agreement while exploring a joint venture opportunity.[73] After the joint venture talks collapsed, Orbus alleged that Boston Scientific misappropriated stent designs disclosed under the disclosure agreement.[74] The relationship of the parties was relevant to determining under which legal doctrine the statute of limitations tolled.[75] The court observed, "[t]hough the existence of a fiduciary relationship is typically a factual determination, '[b]usiness relationships or arms length transactions do not in general rise to the level of a fiduciary relationship.'"[76] The

court's conclusion, that one party placing confidence and trust in the other party does not necessarily transform a business relationship into a fiduciary relationship, is consistent with the general observation that business or arms-length relationships do not become fiduciary relationships as a matter of course; it is not a holding that they can *never* rise to this level. *Orbus* does not support the contention that arms-length and fiduciary relationships are mutually exclusive.

The disputes in *Szalla*[77] and *Schwenk*[78] arose from attempts to form or dissolve limited partnerships or corporations; both courts concluded that disputes concerning the formation or separation of those entities did not constitute "commercial transactions" within the meaning of the UTPA. In contrast, AIC's largest claim against PDI arose from AIC's allegation that PDI fraudulently administered two commercial leases of PDI-owned aircraft. As to the aircraft leases, PDI's relationship with AIC was that of a vendor providing aircraft and aircraft support services in a commercial transaction. PDI's status as part owner of AIC does not exempt the actions it took as a vendor from the purview of the UTPA.

A case that is more analogous to the facts of this one is *Sara Lee Corp. v. Carter*, a case from North Carolina.[79] An employee of Sara Lee who was authorized to purchase computer parts and services for Sara Lee set up four separate businesses to engage "in self-dealing by supplying Sara Lee with computer parts and services at allegedly excessive cost."[80] The court held that although the defendant had a fiduciary relationship with the company as an employee, "defendant and

---

68. *Id.*

69. *Id.*

70. *Id.*

71. *Id.* at 682, *11 (quoting *Erie Ins. Co. v. Hickman*, 622 N.E.2d 515, 518 (Ind.1993)).

72. 694 F.Supp.2d 106 (D.Mass.2010).

73. *Id.* at 110.

74. *Id.*

75. *Id.* at 115.

76. *Id.* at 116 (quoting *Savoy v. White*, 139 F.R.D. 265, 267 (D.Mass.1991)).

77. 421 Mass. 448, 657 N.E.2d 1267, 1268–69 (1995).

78. 483 F.Supp.2d 81, 83, 87 (D.Mass.2007).

79. 351 N.C. 27, 519 S.E.2d 308 (1999).

80. *Id.* at 309.

plaintiff clearly engaged in buyer-seller relations in a business setting, and thus, ... defendant's fraudulent actions [fell] within the ... statutory prohibition of unfair and deceptive acts." [81]

During oral argument before our court, PDI argued that the North Carolina Supreme Court's subsequent decision in *White v. Thompson*[82] represented a departure from *Sara Lee*. PDI urged us to read *White* as an instance where unfair conduct between partners was held to be outside the scope of North Carolina's UTPA. *White* concerned ACE Fabrication and Welding (ACE),[83] a company formed by Charles White, Earl Ellis, and Andrew Thompson to perform specialty construction and fabrication work for Smithfield Packing Company, Inc.[84] ACE hired Thompson's father, Douglas Thompson, as an accountant.[85] White and Ellis later claimed that Andrew Thompson: (1) misinformed them of ACE's scheduled projects; (2) sent jobs intended for ACE to a small group he formed outside of the partnership (PAL); (3) conspired with workers at Smithfield to divert work intended for ACE to PAL; and (4) conspired with his father to improperly maintain and keep the books for ACE.[86]

The jury found that Andrew Thompson breached his fiduciary duty to ACE and the superior court awarded treble damages under the UTPA.[87] On appeal, the North Carolina Supreme Court held that the UTPA did not apply because there was only a breach of a fiduciary duty and Thompson's conduct occurred within ACE's "internal operations." [88]

The primary distinction between *White* and this case is that, in *White*, Thompson was funneling business from ACE to a business that he operated for his own benefit. His breach was failing to meet his fiduciary

obligations to ACE by sending business elsewhere. In contrast, PDI owned two aircraft that it leased to AIC. In relation to the aircraft leases, AIC and PDI acted as separate entities in arms-length transactions. The relationship between PDI and AIC fits more closely with the conduct in *Sara Lee*, where an employee set up business entities that contracted to provide computer parts and services for Sara Lee.

In this case, the superior court cited the Connecticut case *Spector v. Konover*[89] to support its conclusion that the UTPA applies to related-party transactions. In *Spector*, the defendant placed funds into an account where they were commingled with funds from other businesses he ran.[90] He withdrew money designated for the company that Spector and Konover jointly operated and used it to profit his other enterprises.[91] The court held that the UTPA applied to Konover's conduct and affirmed that "where one's actions go 'well beyond governance of the [partnership], and [place] him in direct competition with the interests of the [partnership]'" UTPA claims apply.[92] In our view, the superior court correctly concluded that PDI's interest in the aircraft leases was in direct conflict with AIC's interest, just as Konover's conduct placed his interest in direct competition with the interests of the partnership.

We find no error in the superior court's denial of PDI's motion for JNOV on the issue of the applicability of the UTPA to intra-corporate actions. Even where a party has a fiduciary relationship with a business entity, the UTPA can apply if the parties also engage in arms-length commercial transactions. The evidence established that PDI's interaction with AIC constituted a "commer-

---

81. *Id.* at 312.

82. 364 N.C. 47, 691 S.E.2d 676 (2010).

83. *Id.* at 677.

84. *Id.*

85. *Id.*

86. *Id.* at 676–78.

87. *Id.* at 678.

88. *Id.* at 680.

89. 57 Conn.App. 121, 747 A.2d 39 (2000).

90. *Id.* at 42–43.

91. *Id.*

92. *Id.* at 46 (citing *Fink v. Golenbock*, 238 Conn. 183, 680 A.2d 1243 (1996)).

cial transaction" within the meaning of the UTPA.

### C. The Superior Court Erred In Not Ruling As A Matter Of Law That The Jury's Finding of Fraudulent Conduct Was A Material Breach Of The Operating Agreement Under The Circumstances Of This Case.

The jury found that PDI's fraudulent conduct and breach of the covenant of good faith and fair dealing resulted in $7.3 million in damages during the 6 1/2 years it managed AIC. PDI conceded that it inappropriately billed AIC $1,902,827 in charges but in its closing argument, PDI argued that because AIC made significant profits under its direction, the operating agreement's central purpose was satisfied. PDI suggested that AIC's profitability during this period rendered any breach of the operating agreement immaterial.

The jury's special verdict form reflects its finding that PDI did not materially breach the operating agreement. The jury awarded PDI the contractual premium price of $12 million as compensation for PDI's ownership interest in AIC. AIC moved for JNOV. It argued that the jury's verdict was inconsistent as a matter of law because the jury could not find that PDI engaged in fraudulent conduct without also deciding that PDI had materially breached the parties' operating agreement. The superior court ruled that "the question of whether defendants materially breached the contract, and thus whether plaintiffs' performance is excused, was appropriately sent to the jury as it present[ed] questions of fact." The superior court reasoned that "PDI continued to manage AIC, to bid for and perform contracts, and continued to earn money" and that the jury could have properly found that the fraud was immaterial. On appeal, AIC argues the superior court erred by denying its motion for JNOV. We agree with AIC.

### 1. AIC was not required to move for directed verdict.

■■■■ PDI argues that AIC did not preserve its right to move for a JNOV on the materiality of its breach because AIC did not file a motion for a directed verdict arguing that PDI's fraudulent misconduct was a material breach of the operating agreement. As explained, a motion for directed verdict normally is required to preserve an issue for a subsequent motion for JNOV. But there is an exception to this rule when the basis for a JNOV motion is an inconsistency in a jury's verdict that could not have been known before the case was submitted to the jury. A motion for JNOV to resolve such an inconsistency is proper.[93]

This case falls within the exception. It was only after the special verdict revealed the jury's findings that PDI engaged in fraud and intentional misconduct but did not materially breach the operating agreement, that it became apparent there might be an inconsistency in the verdict. Under these circumstances, AIC's motion for JNOV was properly raised even though it was not preceded by a motion for directed verdict on the same issue.

### 2. The jury's finding that PDI engaged in fraud by affirmative misrepresentation and non-disclosure required the conclusion that PDI materially breached the operating agreement under the circumstances of this case.

■■■ AIC argues that the affirmative misrepresentations and non-disclosures PDI made in conjunction with the aircraft leases materially breached the operating agreement as a matter of law. It argues that PDI's material breach excused Peak and Nabors from the contractual obligation to pay a premium price for PDI's 20% ownership interest in AIC.[94]

---

**93.** See, e.g., Pierce v. S. Pac. Transp. Co., 823 F.2d 1366, 1369–70 (9th Cir.1987) (holding that directed verdict is not prerequisite to JNOV when particular finding by jury negates the party's liability); Traders & Gen. Ins. Co. v. Mallitz, 315 F.2d 171, 175 (5th Cir.1963) (holding general rule that "failure to move for a directed verdict precludes a review as to the sufficiency of the

evidence" not applicable where JNOV motion goes "to the proper judgment to be entered upon the special verdict").

**94.** Peak and Nabors do not dispute that PDI is entitled to compensation for its 20% ownership interest in AIC. The only evidence of the fair

Our decision in *Coffel v. Steward* supports AIC's argument.[95] Coffel and Steward "were co-owners of a Piper PA–12 aircraft. The plane was wrecked in September 1972, ... when the plane [piloted by Steward] turned over on a remote lake on the Alaska Peninsula."[96] Coffel accepted $3,500 for his interest in the plane because Steward told Coffel that the aircraft had been "totalled" and "the parties had agreed that if either party wrecked the aircraft he would pay his co-owner $3,500 for the latter's interest."[97] It was later revealed that Steward had been able to make sufficient repairs to allow the plane to be flown to Anchorage and restored.[98] Coffel brought suit establishing at trial that the restored value of the plane was $18,000.[99] The superior court ruled that "Steward was guilty of fraud in negotiating his purchase of Coffel's interest."[100] And the superior court concluded that the finding of fraud constituted a material breach of the parties' agreement.

On appeal, we held "that every contract contains an implied term that the parties thereto will act honestly toward one another with respect to the subject matter of the contract."[101] We held that there was sufficient evidence to support the "conclusion that Steward was guilty of fraud in negotiating his purchase of Coffel's one-half interest"[102] and that the superior court's finding of fraud was sufficient support for its conclusion that "Steward materially breached the contract."[103] Finally, we said, "[t]his breach, in our opinion, was a material breach, sufficient to preclude Steward from enforcing the remaining terms of the agreement, i.e., the $3,500 buy-out provision."[104] Our decision in *Coffel* is supported by the rule in other jurisdictions that fraud and other forms of intentional wrongdoing constitute material breaches of contract as a matter of law.[105]

At trial, PDI suggested that the purpose of the operating agreement was to make a profit, and because that purpose was achieved, the jury reasonably decided its conduct was not a material breach.[106] We have not ad-

---

market value of the interest valued it at $3,931,200.

95. 611 P.2d 543, 546 (Alaska 1980).

96. *Id.* at 544.

97. *Id.*

98. *Id.*

99. *Id.* at 545.

100. *Id.* at 546.

101. *Id.* at 546.

102. *Id.*

103. *Id.*

104. *Id.*

105. *See, e.g., Christopher Village, LP v. United States,* 360 F.3d 1319, 1336 (Fed.Cir.2004) (holding that company's "conscious effort to defraud" by submitting false data "constitutes a material breach as a matter of law"); *First Interstate Bank of Idaho v. Small Bus. Admin.,* 868 F.2d 340, 342–44 (9th Cir.1989) (upholding summary judgment ruling that bank's unauthorized disbursements and false statements constituted material breach of contract relieving the Small Business Administration from performance of

loan guarantee); *LJL Transp., Inc. v. Pilot Air Freight Corp.,* 599 Pa. 546, 962 A.2d 639, 652 (2009) (affirming summary judgment decision that franchisee's fraud constituted material breach of contract justifying immediate termination of franchise agreement despite contrary contract provision because "[s]uch a breach is so fundamentally destructive, it understandably and inevitably causes the trust which is the bedrock foundation and veritable lifeblood of the parties' contractual relationship to essentially evaporate").

PDI cited *Wirum & Cash, Architects v. Cash,* 837 P.2d 692, 708 (Alaska 1992), to support its contention that a finding of fraud does not necessitate a finding of material breach. But *Wirum* dealt solely with breach of fiduciary duty, not fraud. It does not control the outcome of this case.

106. The superior court appears to have adopted a similar reasoning. In denying AIC's motion for judgment notwithstanding the verdict, the superior court wrote:

In the context of the amounts of money involved in this case, over the course of the relationship between the parties, AIC was worth about $40 million, and AIC made approximately $39 million for each of the partners. Thus, given the many components of the Operating Agreement and the continued performance of the Operating Agreement, the jury could have found that the breach was not material. Although Ellsworth/PDI may have

dressed this argument before, but in *Larken, Inc. v. Larken Iowa City LP*, the Iowa Supreme Court rejected it.[107] The Iowa court wrote that "[w]hile profitability is a significant purpose of the management agreement, the honesty of the parties is also an integral, although unexpressed, component of the agreement."[108] The court held that the "acts of self-dealing found by the district court were so serious that they frustrated one of the principal purposes of the management agreement, which was to manage the hotel in the best interests of the owner and to be honest and forthright in its dealings."[109] The court further explained that self-dealing is a breach of the implied duty of honesty and fidelity that goes "to the heart of the contract" and that "no amount of payment for past thefts by [a self-dealing party] could ever restore the business trust and confidence."[110]

We find the rationale of the Iowa Supreme Court to be compelling, and it is directly applicable to the facts of this case. The jury found that PDI's misconduct and self-dealing constituted fraud by affirmative misrepresentation and fraud by non-disclosure. Its special verdict form includes findings that PDI violated the UTPA by: (1) engaging in unfair or deceptive acts in connection with aircraft services; (2) failing to disclose material information in connection with the aircraft leases; and (3) making false or misleading representations in connection with aircraft services. The jury also found that PDI: (1) converted money or property belonging to AIC in connection with aircraft services; (2) breached its fiduciary duties in connection with aircraft services; and (3) breached its duty of good faith and fair dealing in connection with aircraft services. The jury assessed the damages attributable to this conduct at $7,316,157. The reasoning in *Coffel* is sound, and it has been echoed by other courts in similar situations.[111] We agree with the Iowa Supreme Court that honesty of the parties to a management agreement is an integral component of the agreement, and we specifically reject the view that fraud cannot constitute a material breach just because the defrauded party still makes a profit.

On appeal, PDI argues that every finding of fraud should not amount to a material breach. It provides the hypothetical example of a long-time employee stealing a box of pencils on the last day of work and posed the question whether such an indiscretion should warrant the termination of the employee's pension benefits. The extreme example PDI cites is not one we are confronted with; the jury in this case found multiple acts of fraudulent conduct by PDI extending over a multi-year period that caused millions of dollars in damages.

On the facts of this case, the jury's finding that PDI committed fraud compels the conclusion that PDI materially breached the operating agreement as a matter of law; given the nature of the parties' relationship and the jury's findings regarding PDI's conduct, reasonable persons could not differ on this question. The superior court erred by not granting AIC's motion for JNOV on the issue of the materiality of PDI's breach.[112]

### D. The Motion For JNOV On Ellsworth's Fraud In The Inducement Claim Should Have Been Granted.

■ The parties' operating agreement prohibited "PDI [and] its Affiliates, including Ellsworth," from engaging in any similar business in Alaska for one year after PDI was no longer a member of AIC. In an early

---

taken liberties with AIC money, PDI continued to manage AIC, to bid for and perform contracts, and continued to earn money.

107. 589 N.W.2d 700, 701 (Iowa 1999) (en banc).

108. *Id.*

109. *Id.* at 704.

110. *Id.* at 704–05 (internal quotation marks and citations omitted).

111. *See Optimal Interiors, LLC v. HON Co.*, 2011 WL 1207231, at *9 (S.D.Iowa Mar.14, 2011); *Trinity Indus., Inc. v. Greenlease Holding Co.*, 2010 WL 419420, at *5 (W.D.Pa. Jan.29, 2010); *Manpower Inc. v. Mason*, 377 F.Supp.2d 672, 679 (E.D.Wis.2005); *LJL Transp., Inc.*, 962 A.2d at 644.

112. PDI also argues that the doctrine of invited error bars AIC's argument on the materiality of PDI's breach. But AIC does not dispute that this issue of materiality was properly submitted to the jury; it argues that reasonable jurors could not

pre-trial proceeding, the superior court granted AIC's request for an injunction prohibiting Ellsworth and PDI from competing with AIC.[113] At trial, Marrs and Ellsworth both testified that the parties did not intend Ellsworth to be bound personally when they negotiated the operating agreement. After hearing the evidence, the superior court decided the operating agreement was ambiguous as to whether Ellsworth was personally bound by the non-compete clause, and it sent the issue to the jury. It observed that some provisions of the operating agreement only referred to PDI, but that even those parts of the agreement acknowledged Ellsworth's status as PDI's sole shareholder.

The jury decided that the parties did intend to personally bind Ellsworth to the operating agreement's non-compete clause. It also found that Ellsworth was fraudulently induced into signing the agreement. Based on these findings, the superior court ruled that the preliminary injunction prohibiting Ellsworth from competing with AIC had been improvidently granted and it ruled that Ellsworth was entitled to the $500,000 bond posted when the injunction was entered.

AIC filed motions for summary judgment, directed verdict, and JNOV on PDI's claim of fraud in the inducement. All of these motions were denied by the superior court. AIC argues on appeal that the superior court erred by allowing the jury to decide whether oral representations inconsistent with the parties' written contract could support a claim for fraud in the inducement.[114]

Ellsworth argues that he signed the operating agreement only in his capacity as president of PDI. He points to the signature line on the operating agreement, which identifies him as president of PDI, and to the fact that the agreement did not have a separate signature line for Ellsworth to sign in his individual capacity. Ellsworth also cites a series of cases from Illinois where courts have considered ambiguities between the language of agreements purporting to bind persons individually and signatures indicating that an individual is the agent of a separate entity. Under such circumstances, courts have found contracts sufficiently ambiguous to allow the presentation of extrinsic evidence to resolve the ambiguity. But none of these cases dealt with claims that the signing party was fraudulently induced to enter agreements in a personal capacity.[115] Further, the jury in this case *did* hear the extrinsic evidence concerning the negotiation and drafting of the operating agreement, and it resolved any ambiguity in AIC's favor.

In *Johnson v. Curran* we examined the consideration of parol evidence in a claim that one party was fraudulently induced to enter into a written contract.[116] *Johnson* involved a contract between Le Pussycat Lounge and a band called Jabberwock.[117] The parties' written agreement provided that the band would perform at the nightclub, but the club owner testified that the parties also orally agreed that the show could be cancelled with two weeks' notice if the band did not draw enough patrons.[118] The cancellation provision was not included in the written

have concluded the breach was immaterial. The invited error doctrine does not apply.

**113.** Initially, the superior court entered an injunction enforcing the non-compete agreement against PDI only. AIC petitioned for review and our court directed the superior court to determine whether Ellsworth could be protected by a bond. The superior court then required AIC to post a $500,000 bond and it extended the scope of the injunction so that it applied to Ellsworth personally, as well as PDI.

**114.** PDI argues that AIC waived this argument by failing to raise the inconsistency in the verdict before the jury was discharged. But we agree with AIC that this is not an instance where the verdict form itself presents an inconsistency. The question is whether the evidence supported the jury's finding that Ellsworth was fraudulently

induced into entering the operating agreement containing the non-compete provision.

**115.** *Zahl v. Krupa,* 365 Ill.App.3d 653, 302 Ill. Dec. 867, 850 N.E.2d 304 (2006); *Addison State Bank v. Nat'l Maint. Mgmt., Inc.,* 174 Ill.App.3d 857, 124 Ill.Dec. 313, 529 N.E.2d 30 (1988); *Wottowa Ins. Agency, Inc. v. Bock,* 104 Ill.2d 311, 84 Ill.Dec. 451, 472 N.E.2d 411 (1984); *Knightsbridge Realty Partners, Ltd.–75 v. Pace,* 101 Ill. App.3d 49, 56 Ill.Dec. 483, 427 N.E.2d 815 (1981).

**116.** 633 P.2d 994, 997 (Alaska 1981).

**117.** *Id.* at 995.

**118.** *Id.*

contract.[119] Jabberwock did not draw the crowd the owner expected and she gave the band notice that the agreement would be terminated.[120] The band sued to recover payment for the two weeks remaining in its written contract.[121] The owner of the nightclub asserted an affirmative defense that the band orally modified the contract and counterclaimed for false representation and fraud because the band did not draw a sufficient crowd.[122] The district court granted partial summary judgment in favor of the band "on the basis of the executed written contract" and entered final judgment pursuant to Civil Rule 54(b).[123] The superior court affirmed the judgment, but on appeal to our court we held that "parol evidence ... [is] admissible [in a fraudulent inducement claim] even if the written contract is viewed as completely integrated."[124] We also held that the allegedly inconsistent oral promise was insufficient to show fraudulent inducement, affirming the district court's order granting summary judgment on that claim.[125] We held that a claim for fraudulent inducement can only succeed if there is a demonstration that the party "misapprehended the content of the written agreement" or "was induced to sign it by any deception, active or passive."[126] Here, Ellsworth asserted misapprehension and deception, but he did not point to any evidence in the record that supported his assertions.

The jury found that AIC and PDI intended Ellsworth to be bound to the non-compete provision, and our review of the record convinces us that this finding was amply supported by the evidence. First we consider the 1998 operating agreement entered into by Nabors, Peak, and PDI. It included the sale of a 20% ownership interest in AIC to PDI and an agreement that PDI would manage AIC. The jury heard evidence establishing that the non-compete provision binding Ellsworth was in all seventeen drafts of the operating agreement generated during the parties' negotiations. Ellsworth admitted to reading the draft operating agreement. Second, we consider that all parties were represented by experienced counsel during the negotiation process, including PDI and Ellsworth. It is also notable that PDI and Ellsworth negotiated *other* changes to the operating agreement's non-compete provision, but not a change that would have removed Ellsworth from its scope. Finally, we consider that the 1995 agreement required approval by the boards of directors for Peak/CIRI and for Nabors, and the boards considered documents that included the non-compete clause.[127] Counsel for Peak/CIRI, Mark Kroloff, and the CEO for Nabors, Gene Isenberg, testified that a personal non-compete clause for Ellsworth was a key term of the parties' agreement.

PDI argues that the potential discrepancy in the operating agreement's signature line may be an indication that Ellsworth was fraudulently induced into signing the contract. But the case law from Illinois that PDI relies on does not stand for the proposition PDI advances, and PDI offers no other arguments to support this claim. Our own case law requires a showing that Ellsworth "misapprehended the content of the written agreement" or "was induced to sign it by any deception, active or passive."[128] No such showing was made.

The superior court erred by not granting JNOV on PDI's fraud in the inducement claim.[129]

119. *Id.*

120. *Id.*

121. *Id.*

122. *Id.*

123. *Id.*

124. *Id.* at 997

125. *Id.* at 998.

126. *Id.*

127. The boards of Peak and Nabors voted on formation of the joint venture. CIRI's board voted to authorize Peak to enter into the joint venture.

128. *Johnson,* 633 P.2d at 998.

129. PDI argues that AIC's pre-trial injunction was erroneously entered and that its damages should not be limited to the amount of the bond posted when the injunction was granted. But because the evidence did not support the finding that Ellsworth was fraudulently induced into signing the operating agreement containing the

### E. The Superior Court Did Not Err By Determining That AIC's Aircraft Lease Claims Were Not Barred By The Statute Of Limitations.

PDI argues that the statute of limitations barred AIC's claims for aircraft lease payments made more than two years before AIC's tort claims were filed and more than three years before AIC's contract claims were filed. The superior court ruled that a three-year statute of limitations period applied because this case primarily involved claims of breach of fiduciary duty. The exception was AIC's UTPA claims, which are governed by a two-year statute of limitations. All parties agree that the statute of limitations defense was a matter for the superior court to decide.

PDI does not appeal the limitation periods determined by the superior court. Instead, PDI argues that the superior court erred when it decided, as a finding of fact, when the statute of limitations began running. AIC counters that the statute of limitations was tolled for an extended period of time because PDI's fraudulent conduct prevented it from discovering PDI's wrongdoing. But in PDI's view, AIC was not entitled to the benefit of a tolling period because it was utterly unreasonable in failing to discover PDI's fraudulent activities, and the superior court's ruling to the contrary was clearly erroneous.[130]

Evidence was introduced at trial to show that Carl Marrs was responsible for supervising Ellsworth's management of AIC, but the superior court determined, "Marrs never actively supervised or scrutinized ... Ellsworth, but rather allowed him carte blanche to manage AIC." In late 2004, Ellsworth directed his attorney to look into breaking PDI's operating agreement with AIC. Also in late 2004, Marrs left CIRI. AIC and PDI later agreed to use Marrs as a mediator to discuss ending the agreement between AIC and PDI. AIC purchased PDI's interest in the joint venture on April 30, 2005. Peak

and Nabors took over management of AIC in August of that year and discovered what they suspected was fraudulent and criminal activity by PDI after PDI was replaced. Peak and Nabors also discovered that PDI had shredded 6,000 pounds of documents shortly before leaving AIC; AIC suggested that this hindered its ability to discover and document its claims. Peak and Nabors reported their suspicion of criminal activity to the FBI and the United States Attorney's Office shortly after they assumed management responsibility for AIC.

To counter PDI's statute of limitations argument, AIC presented expert testimony that it was not possible to detect PDI's fraudulent conduct sooner because financial statements PDI provided to AIC did not contain specific enough information about the use of the aircraft under the two leases. The evidence showed that PDI provided one-or-two-page invoices listing the hours flown and amount charged. PDI started charging $100,000 in monthly fees for the use of one jet in 2002, but the invoices did not provide any details about the passengers or the purpose of flights. AIC's forensics auditor, Paul Ficca, testified that PDI's fraud was systematic, continuous, and covered-up assiduously. Ficca identified several instances of fraudulent conduct he suggested Peak and Nabors could not have discovered because they had not had access to complete records. These examples include: (1) $1.4 million in charges for hours of aircraft services when the jet did not fly; (2) charges of $100,000–$125,000 per month for aircraft services when PDI did not have a plane available for AIC's use; and (3) charges of over $700,000 for pilot wages and training that were PDI's responsibility under the leases.

After considering the evidence, the superior court concurred with the jury's findings and ruled that there had been "both non-disclosure and active misrepresentation regarding the aircraft services." The court specifically found that "[t]he information necessary to evaluate whether there were causes

non-compete clause, we do not need to reach this damages issue.

**130.** *Palmer v. Borg–Warner Corp.*, 838 P.2d 1243, 1251 (Alaska 1992) ("[A] party should be charged

with knowledge of ... fraudulent misrepresentation or concealment only when it would be utterly unreasonable for the party not to be aware of the deception.").

of action did not surface until, at the earliest, when PDI and Mr. Ellsworth were removed as the Managing Partner of AIC." Because the superior court found that it was only after taking over AIC's management that Peak and Nabors had access to the information that revealed their causes of action, the superior court was not clearly erroneous in determining that the statute of limitations was tolled on its claims prior to August of 2005.[131] AIC filed suit in 2005.

PDI also argues the superior court erred by failing to rule on its summary judgment motion raising the statute of limitations defense until after trial. But resolution of this defense required extensive factual testimony and we have recognized that addressing the substantive merits of a claim at a preliminary evidentiary hearing can create tension with a party's right to a jury trial.[132] Further, though PDI argues that the court's procedure resulted in an "undifferentiated jury award" that "undoubtedly included sums for claims that were time barred," our review of the record does not show that PDI objected to the court's procedure. If PDI wished to secure a differentiated damages award, it was PDI's burden to make this request at trial.

The superior court did not clearly err by deciding AIC's claims were not barred by the statute of limitations.

## F. The Superior Court Did Not Abuse Its Discretion By Denying PDI Access To Discovery In Support Of Its Abuse Of Process Claim.

■■■ When Peak and Nabors discovered that PDI's conduct may have amounted to fraud, they reported PDI's actions to the FBI and the United States Attorney's Of-

fice. One of PDI's counterclaims alleged that AIC abused the judicial process by making these reports. To support its claim for abuse of process, PDI sought discovery of attorney-client communications between AIC and its counsel under Alaska Evidence Rule 503(d)(1).[133] A discovery master appointed by the superior court concluded that PDI failed to establish a prima facie case that a crime or fraud had been committed when AIC reported its suspicions to the U.S. Attorney's Office and to the FBI, and he recommended that the superior court deny discovery of the privileged communication between AIC and its counsel. The superior court adopted the discovery master's recommendation. At trial, AIC gave notice that it intended to introduce evidence that PDI may have committed a federal crime through a fraudulent $1.8 million loan application. PDI responded by moving to dismiss its abuse of process claim, with prejudice. The superior court orally granted PDI's motion.

PDI appeals the superior court's order denying it discovery of AIC's attorney-client privileged communications. It argues this discovery was relevant to its abuse of process claim and that the attorney-client privilege must give way on the grounds that AIC perpetrated a fraud or illegal act by reporting its conduct to the United States Attorney's Office and FBI.

■■■ The first reason this portion of PDI's appeal is not meritorious is that this argument was waived. We have repeatedly held that a party cannot preserve an issue for appeal if it agrees to the dismissal or settlement of the claim.[134] PDI did not preserve its right to appeal the superior court's discovery ruling.

**131.** *Hutton v. Realty Execs., Inc.,* 14 P.3d 977, 980 (Alaska 2000) ("[T]he statute of limitations does not begin to run until the plaintiff discovers, or reasonably should discover, the existence of all the elements of his or her cause of action.") (citing *Greater Area Inc. v. Bookman,* 657 P.2d 828, 829 (Alaska 1982)).

**132.** *Williams v. Williams,* 129 P.3d 428, 431 (Alaska 2006).

**133.** Communications between attorneys and clients are generally privileged and not subject to

discovery. But Alaska Evidence Rule 503(d)(1) provides an exception to attorney-client privilege "[i]f the services of the lawyer were sought, obtained or used to enable or aid anyone to commit or plan to commit what the client knew or reasonably should have known to be a crime or fraud."

**134.** *Uncle Joe's Inc. v. L.M. Berry & Co.,* 156 P.3d 1113, 1120–21 (Alaska 2007); *Legge v. Greig,* 880 P.2d 606, 607–09 (Alaska 1994).

[24] Even if this argument had been preserved, the superior court did not abuse its discretion by refusing to permit discovery of AIC's privileged communications. PDI is correct that there is an exception to the attorney-client privilege that can apply if the party seeking discovery is able to establish a prima facie case that the communications at issue involved perpetration of a crime or fraud.[135] But Peak and Nabors argued that they reported what they believed to be criminal activity by PDI, and in order for PDI to show a prima facie claim of abuse of process, PDI would have had to establish not only an ulterior purpose, but also a wilful act in the use of the process "not proper in the regular conduct of the proceeding."[136] PDI does not cite any evidence in the record supporting its assertion that AIC wrongfully reported evidence of what it believed to be criminal activity.[137] The jury found PDI liable for fraud and conversion, and these findings were not appealed. On this record, we cannot say that the superior court abused its discretion by denying PDI access to privileged communications.[138]

### G. The Superior Court's Quasi–Estoppel Instruction Was Not Erroneous.

Quasi-estoppel was one of the defenses PDI asserted in response to AIC's claims that it breached the contractual and fiduciary duties it owed AIC pursuant to the operating agreement and the Alaska Revised Limited Liability Company Act (LLC Act). PDI argued that the operating agreement was amended by the parties' "words and conduct,"[139] and that it would be unconscionable to enforce it. The superior court found that PDI did not expect the operating agreement to be enforced and that it would not have been enforced if Marrs had remained at the helm of CIRI and Peak.

The superior court submitted the quasi-estoppel defense to the jury using an instruction that PDI challenges on appeal. The instruction asked the jury to decide whether Peak and Nabors asserted through words or conduct that Ellsworth and PDI were entitled to receive additional funds beyond arms-length value, whether Peak and Nabors had full knowledge of all relevant facts when they represented that Ellsworth and PDI were entitled to receive the additional funds beyond arms-length value, and whether Peak's and Nabors's prior position was so inconsistent with their current efforts to recover the funds and damages that it would be unconscionable to allow such recovery.[140]

▇▇▇ On appeal, PDI argues that the superior court applied the wrong burden of proof to the quasi-estoppel defense. It contends that PDI should only have been required to prove the elements of quasi-estoppel by a preponderance of the evidence rather than the clear and convincing standard. AIC responds that this equitable defense should have been decided by the court rather than by the jury,[141] but it also argues

---

135. Alaska R. Evid. 503(d)(1).

136. *Greywolf v. Carroll*, 151 P.3d 1234, 1243–44 (Alaska 2007) (quoting *Sands v. Living Word Fellowship*, 34 P.3d 955, 961 (Alaska 2001)).

137. There is no evidence that criminal charges were ever pursued against PDI or Ellsworth.

138. PDI also claims that there should have been an in camera review of the documents it requested, but as is the case with the order on discovery, the decision "[w]hether or not to grant in camera review is within the discretion of the judge." *Mogg v. Nat'l Bank of Alaska*, 846 P.2d 806, 814 (Alaska 1993) (citing *Cent. Constr. Co. v. Home Indem. Co.*, 794 P.2d 595, 599 (Alaska 1990)). We find no abuse of discretion here.

139. Ellsworth testified that shortly after the operating agreement was signed, Marrs told him to "run the company as if [I] owned it a hundred percent, to make money," and "[t]hat's the way I operated." When asked whether he considered the operating agreement to be "out the window," Ellsworth testified that he "thought there was no reason really to look at the agreement." In a March 2005 letter written shortly before he left AIC, Ellsworth reminded Marrs that in their original negotiation Ellsworth did not intend the non-compete provision to apply to him personally.

140. PDI did not argue that quasi-estoppel would have excused fraud or other intentional torts. The instruction directed the jury to consider the defense only as to claims for breach of fiduciary duty and breach of contract.

141. *See Dressel v. Weeks*, 779 P.2d 324, 329 n. 4 (Alaska 1989) ("Thus, in determining whether the doctrine of quasi-estoppel is applicable to the matter before it, the *trial court* should consider

that the superior court provided the jury with the proper instruction on the burden of proof for this defense.

 Quasi-estoppel " 'appeals to the conscience of the court to prevent injustice' by precluding a party from taking a position so inconsistent with one [it] has previously taken that circumstances render assertion of the second position unconscionable." [142] PDI claims "[Peak and Nabors] with full knowledge of the relevant facts, showed through both words and conduct ·that they believed [PDI was] entitled to take certain actions and [to] charge [AIC] for certain costs, and that it was unconscionable for them to later change their position and allege that the charges are fraudulent." PDI does not claim that the operating agreement permitted PDI to earn fees in excess of "arms-length value," and Alaska's LLC Act requires operating agreements and amendments to operating agreements be in writing.[143] It also expressly requires the written consent of all members to "authorize a manager or member to perform an act on behalf of the company that contravenes an operating agreement of the company," [144] and it states that self-dealing transactions by a manager or managing member are void unless approved by an official vote at a meeting of the members after full disclosure.[145] Relying on AS

10.50.150(c), the superior court ruled as a matter of law that the operating agreement could not be orally modified.[146] Despite this ruling, the trial court agreed to instruct the jury on the quasi-estoppel defense, and PDI was allowed to argue it to the jury.

 We agree that equitable claims are typically decided by the court rather than the jury, but superior courts are free to submit such questions to the jury for advisory opinions, and that may have been the intent of the superior court here.[147] We do not find error in the superior court's instruction on the burden of proof for this defense. Under our precedent in *Dressel v. Weeks,* the proper burden of proof for quasi-estoppel is clear and convincing evidence.[148] This is the standard the superior court used in its jury instruction and PDI cites no Alaska case in support of the proposition that a "preponderance of the evidence" standard is the correct one for quasi-estoppel.[149, 150]

### H. We Vacate The Superior Court's Determination Of Prevailing Party.

 Under Alaska Civil Rule 82, "[e]xcept as otherwise provided by law or agreed to by the parties, the prevailing party in a civil case shall be awarded attorney's fees." [151] "The prevailing party is the one

---

whether the party asserting the inconsistent position has gained an advantage or produced some disadvantage through the first position; whether the inconsistency was of such significance as to make the present assertion unconscionable; and whether the first assertion was based on full knowledge of the facts.") (emphasis added) (quoting *Jamison v. Consol. Util., Inc.,* 576 P.2d 97, 102 (Alaska 1978)).

142. *Rockstad v. Erikson,* 113 P.3d 1215, 1223 (Alaska 2005) (quoting *Jamison,* 576 P.2d at 102.)

143. *See* AS 10.50.570(g) ("Before filing a certificate of conversion to a limited liability company with the department, a limited liability company agreement must be approved in the manner provided for by the document, instrument, agreement, or other writing governing the internal affairs of the other entity and the conduct of its business, or by applicable law, as appropriate.").

144. AS 10.50.150(c)(3).

145. AS 10.50.140(a).

146. The superior court made this ruling in granting AIC's motion for partial summary judgment regarding oral modification to the AIC operating agreement.

147. *See* Alaska R. Civ. P. 39(c).

148. 779 P.2d 324, 330–31 (Alaska 1989).

149. PDI did cite authority showing that other states use this standard in quasi-estoppel claims.

150. We also observe that the jury decided that PDI was liable under contract, tort, and UTPA theories for actions it took in conjunction with the aircraft leases. The equitable quasi-estoppel defense only applied to the claims for breach of contract and breach of fiduciary duty. The jury awarded over $7.3 million in damages on AIC's fraud, conversion, and UTPA claims. Even if we found error in this jury instruction, AIC would still be entitled to at least $7.3 million in damages for conduct related to the aircraft leases.

151. Alaska R. Civ. P. 82(a).

who has successfully prosecuted or defended against the action, the one who is successful on the 'main issue' of the action and 'in whose favor the decision or verdict is rendered and the judgment entered.'"[152] The superior court ruled that PDI was the prevailing party and it awarded fees and costs in its favor. In light of our resolution of the issues presented on appeal, the superior court's prevailing party determination must be vacated and remanded for reconsideration. The superior court's award of attorney's fees is also vacated.

### I. PDI And Ellsworth's Claim Of Statutory And Contractual Indemnity Is Moot.

PDI argues that it was error for the superior court to solely award Rule 82 attorney's fees to PDI rather than awarding attorney's fees to both PDI and Ellsworth as a matter of statutory and contractual indemnity. The superior court noted the LLC Act contains two provisions relevant to fees incurred by members: (1) a mandatory indemnification provision under AS 10.50.148(c); and (2) permissive indemnity under AS 10.50.148(a) and (b). The superior court determined neither statutory nor contractual indemnity applied to the case.

PDI only sought indemnification "for those litigation expenses that reflected 'the extent that [it was] successful on the merits' and therefore had a *right* to indemnity under AS 10.50.148(c)." On appeal, PDI gauges its success by the "net judgment" in its favor. In PDI's view, PDI was successful on two claims: the fraudulent inducement claim and the claim that PDI's breach was immaterial and did not excuse Peak and Nabors from paying the contractual premium price of $12 million to purchase PDI's ownership interest. We reverse the superior court's order denying the motion for JNOV on PDI's fraud in the inducement claim, and we reverse the superior court's ruling on material breach, holding that the jury's findings of fraud and wilful misconduct under the circumstances of this case require the conclusion that PDI materially breached the operating agreement as a matter of law. PDI's claim of statutory and contractual indemnity is therefore moot.

### J. We Vacate The Award Of Prejudgment Interest.

As explained, PDI conceded before trial that it over-billed AIC by $1,902,827. The superior court awarded prejudgment interest in favor of AIC on its tort claims, starting the accrual of prejudgment interest as of February 9, 2000. PDI appeals, arguing that the court's calculation was erroneous.

■■■ Under Alaska law, prejudgment interest must be awarded by the superior court absent extraordinary circumstances.[153] We have held that "[p]rejudgment interest should be denied 'in only the most unusual case,' such as double recovery."[154] For tort claims (such as fraud) prejudgment interest begins to accrue on the date of the injury.[155] In *K & K Recycling, Inc. v. Alaska Gold Co.,* our court established that where an ongoing course of conduct breaches a contract, prejudgment interest may be calculated as of the beginning of such conduct and the superior court need not calculate interest "from the date of each impediment."[156]

AIC asked the superior court to award prejudgment interest beginning February 9, 2000, the date of the first of a series of invoices that were included in the $1,902,827 over-billing PDI admitted to before trial.

PDI raises two arguments on appeal. First, PDI argues that the superior court must be able to determine the actual date AIC's tort claims accrued and that the failure

**152.** *Progressive Corp. v. Peter ex rel. Peter,* 195 P.3d 1083, 1092 (Alaska 2008) (quoting *Hillman v. Nationwide Mut. Fire Ins. Co.,* 855 P.2d 1321, 1327 (Alaska 1993)).

**153.** *Farnsworth v. Steiner,* 638 P.2d 181, 184 (Alaska 1981); *see also Cole v. Bartels,* 4 P.3d 956, 958–59 (Alaska 2000) ("[P]rejudgment interest is awarded as a matter of course.").

**154.** *State Farm Fire & Cas. Co. v. Nicholson,* 777 P.2d 1152, 1158 (Alaska 1989) (quoting *Am. Nat'l Watermattress Corp. v. Manville,* 642 P.2d 1330, 1343 (Alaska 1982)).

**155.** *K & K Recycling, Inc. v. Alaska Gold Co.,* 80 P.3d 702, 725 n. 71 (Alaska 2003).

**156.** *Id.* at 725.

to make this determination results in either too much or too little prejudgment interest. Second, PDI argues that the superior court awarded prejudgment interest from an arbitrarily selected date—February 9, 2000—and that using that date over-compensated AIC because some of the wrongful billings were made at significantly later dates. In particular, PDI observes that the parties had not yet entered into the second aircraft lease as of the date the superior court began calculating prejudgment interest. PDI observes that the superior court's "award of prejudgment interest was apparently based on a 'continuing course of conduct' theory," explained in *K & K Recycling.*[157]

We do not reach the merits of PDI's argument on the calculation of prejudgment interest because on remand a new judgment will be entered. Here, we only observe that the record does not appear to include a clear explanation of the methodology used by the superior court to calculate prejudgment interest. On remand, the superior court should make detailed findings explaining its prejudgment interest calculation so the litigants can readily understand the court's reasoning.

## V. CONCLUSION

We AFFIRM the superior court's denial of PDI's motion for JNOV seeking a ruling that the UTPA does not apply to intra-corporate disputes. We AFFIRM the superior court's determination that AIC's aircraft lease

157. *Id.*

claims were not barred by the statute of limitations. We AFFIRM the superior court's decision to deny PDI access to discovery in support of its abuse of process claim. We also AFFIRM the superior court's decision to apply the clear and convincing evidence standard of proof to PDI's quasi-estoppel defense.

We REVERSE the superior court's ruling on the motion for JNOV on the issue whether PDI's conduct was exempt from the UTPA. We REVERSE the superior court's ruling on the JNOV addressing material breach and hold that the jury's findings of fraud and wilful misconduct under the circumstances of this case require the conclusion that PDI materially breached the operating agreement as a matter of law. We REVERSE the superior court's order denying the motion for JNOV on PDI's fraud in the inducement claim, and we VACATE the superior court's determination of prevailing party, award of attorney's fees, and award of prejudgment interest. PDI's claim for statutory and contractual immunity is moot.

WINFREE, Justice, not participating.

