BOLGER, Chief Justice.
I. INTRODUCTION
Maxim Healthcare Services and its Alaska office manager, Alaina Adkins, made misrepresentations while discharging Jesse Collens from Maxim's care, in violation of the company's own policies and procedures. Collens sued them for breach of contract, fraudulent misrepresentation, unfair and deceptive acts and practices under Alaska's Unfair Trade Practices and Consumer Protection Act (UTPA),[1] and intentional infliction of emotional distress (IIED). The superior court ruled for Collens on all his claims and entered a $20,379,727.96 judgment against Adkins and Maxim, which included attorney's fees. Maxim and Adkins now appeal, arguing that (1) they were not liable under the UTPA; (2) the superior court erred in precluding their expert witnesses from testifying at trial; (3) the court's damages award was excessive; and (4) the court's attorney's fee award was unreasonable. We agree that the superior court's attorney's fee award was *193 unreasonable, but on all other issues we affirm the superior court's decision.
II. FACTS AND PROCEEDINGS
In May 2009 Jesse Collens, then 21 years old, was permanently injured in a bicycle accident that left him a C-1 quadriplegic, paralyzed from the neck down, and dependent on a ventilator to breathe. Collens was living in Anchorage when the accident occurred, and he chose to remain there after recuperating to be near friends and family.
Because long-term care facilities in Anchorage are not prepared to serve a ventilator-dependent individual such as Collens, he sought in-home care. In December 2009 he contracted with Maxim, a national healthcare corporation with a home healthcare division, to provide his nursing care. At the time Collens had a prescription for in-home nursing care that was refillable for life. Maxim was licensed as a home health agency in Alaska at all relevant times.
In late 2011 issues arose between Collens and Maxim over the company's management of his care. These issues escalated, and in early March 2012, Alaina Adkins, Maxim's Alaska office manager, met with Collens to discuss his main concerns with Maxim's services.
The following business day, Adkins emailed various members of Maxim's legal and administrative staff about one of the issues Collens had raised. Internal concerns surfaced about the legal compliance of the staff working with Collens. Maxim's Compliance Department produced a report on March 21 that suggested some issues with how Collens's nurses were supplying him insulin as well as other scheduling and dosage discrepancies. In an email responding to the report, Maxim's area vice president wrote, "We are in dangerous territory right now with the liability of this case and we are going to have to seriously consider discharge."
Collens's contract with Maxim included a form that told him of his rights as a patient. In this document Maxim affirmed that Collens had the right to:
Know that the home health plan of care/treatment will be developed by the physician, in cooperation with the appropriate Maxim professional staff member, and with the patient and family to the extent possible.
The document also affirmed that Collens had the right:
Not to be transferred or discharged unless:
a. The individual's medical needs require transfer;
b. The individual's health and safety or that of another person requires transfer or discharge; or
c. The individual fails to pay for services, except as such transfer or discharge is prohibited by law.
d. The individual does not meet any criteria for continued service set forth by Maxim, federal, state, or local statute or regulation.
In accordance with state regulations, Maxim had adopted policies and procedures to govern its provision of home healthcare services.[2] Those policies and procedures stated that a patient could not be discharged from Maxim's home healthcare program without a physician's order.
Collens's care plan was subject to routine recertification every 60 days. Maxim's Alaska Director of Clinical Services visited Collens's house to complete the review necessary for this recertification on March 23. Three days later she submitted the recertification paperwork, noting that "discharge is not warranted."
That same day Adkins requested that Maxim's legal department provide her a draft discharge letter for Collens. This draft letter stated that the discharge had been discussed with Collens's physician and care coordinator and that they agreed with the discharge decision. But in fact neither approved *194 the discharge.[3] The draft discharge letter also included a space for names of other entities that could provide the care needed by the patient. Although Adkins emailed the legal department saying, "We already know that there are no providers in our area that provide this type of service," the discharge letter she eventually delivered to Collens filled in the blank with four agency names. Adkins delivered and read aloud the discharge letter at Collens's home on March 30.
Collens filed suit against Maxim in early 2014, alleging breach of contract and fraudulent misrepresentation.[4] Maxim moved for summary judgment on these claims. Collens opposed and cross-moved for partial summary judgment on the contract claim. In the memorandum supporting that motion, Collens asserted claims under the UTPA for the first time. The superior court denied all motions, finding the existence of disputed facts relevant to the fraud and contract claims. Its order did not address the UTPA claims.
During a protracted pretrial period, multiple discovery disputes arose. Among other things, Collens moved to strike Maxim's expert witnesses, arguing that it had not submitted their reports before the relevant deadline. In April 2017 the superior court granted this motion and precluded Maxim's experts from testifying at trial.
After a six-day bench trial in June 2017, the superior court ruled for Collens on all counts. The court awarded him $4,315,007 in damages for his breach of contract claim. This was trebled under the UTPA's damages provision to total $12,945,021. The court also awarded Collens $400,000 in damages for IIED and $500,000 in punitive damages. The court later awarded Collens $5,676,668.17 in attorney's fees. Maxim appeals.
III. DISCUSSION
Maxim asks us to vacate the superior court's judgment and remand for a new trial on contract and tort damages, with instructions that Maxim was not liable under the UTPA. It also asks us to vacate the fee award as unreasonable. We agree that the superior court's attorney's fee award was unreasonable, but in all other respects we affirm the superior court's judgment. Maxim is liable under the UTPA; its conduct is clearly subject to sanctions under the Act. The superior court's decision to preclude Maxim from presenting expert testimony on damages was not an abuse of discretion. And the court's damages assessment was not excessive.
A. Maxim Is Liable Under The UTPA.
On appeal Maxim makes two main arguments for why the UTPA does not apply to its conduct.[5] First Maxim argues that Collens's UTPA claim was exempt from the Act's coverage because it involved conduct already prohibited by statute or regulation.[6] We refer to this argument as Maxim's "statutory exemption defense." Second Maxim argues that the conduct at issue was a healthcare, not business, decision that should be exempt from UTPA liability.[7] We refer to this as Maxim's "healthcare exemption defense." In response Collens argues that these defenses have been waived as issues for appeal because Maxim failed to develop them sufficiently before the superior court. If they are preserved, he contends that neither exempts Maxim from UTPA liability.
*195 1. Maxim preserved both UTPA defenses.
Whether a particular claim has been waived is a question of law reviewed de novo.[8] Arguments raised for the first time on appeal are generally waived,[9] but those explicitly raised in the trial court may be expanded or refined in appellate argument.[10] Collens contends that Maxim waived the statutory exemption defense by failing to develop it at trial after mentioning it in summary judgment briefing. But Collens's complaint did not include an express claim based on the UTPA. And Maxim later raised the defense in objections to Collens's proposed findings of fact and conclusions of law on this claim. In those objections Maxim cited the statutory exemption and argued that certain statutes and regulations of the nurse licensing board prohibited its disputed conduct. This was adequate to preserve the defense.
Although it is a closer question, Maxim also preserved the healthcare exemption defense. Maxim repeatedly argued that its decision to discharge Collens had nothing to do with the sale or advertisement of goods and services and thus was not covered by the UTPA. The basic premise behind the healthcare exemption defense Maxim asserts on appeal is that the UTPA is intended to apply to a circumscribed set of commercial transactions, not disputes involving the provision of healthcare. Since this defense is fairly characterized as an "expansion or refinement" of arguments Maxim made before the superior court, we also consider it preserved for our review.
2. Collens's UTPA claim was not exempt under AS 45.50.481(a)(1).
Both of Maxim's exemption defenses involve arguments about how to interpret the UTPA. Reviewing these legal questions de novo,[11] we find neither argument persuasive.
Maxim's statutory exemption defense relies on AS 45.50.481(a)(1). This subsection provides that the UTPA does not apply to:
an act or transaction regulated by a statute or regulation administered by the state, including a state regulatory board or commission, unless the statute or regulation does not prohibit the practices declared unlawful in AS 45.50.471.
Put another way, if acts declared unlawful under the UTPA are prohibited by some other state law or regulation, then they are exempt from the UTPA.
We have previously noted that AS 45.50.481(a)(1) "exempts only those acts or transactions which are the subject of 'ongoing, careful regulation.' "[12] And we have emphasized that such regulation must prohibit the specific act in question: "Mere regulation under a separate and distinct statutory scheme, however, satisfies only one prong of [the UTPA's exemption provision]; unfair acts and practices are exempt from the purview of the Act only where the business is both regulated elsewhere and the unfair acts and practices are therein prohibited."[13] To qualify for the statutory exemption, Maxim must show both that its conduct is subject to ongoing, careful regulation and that such regulation prohibits the conduct the superior court identified as violating the UTPA - Maxim's failure to follow its own policies and procedures and its misrepresentations to Collens about his discharge.[14]
*196 Maxim has not met this burden. Alaska Statute 47.32.010 - .900, the chapter governing "Centralized Licensing and Related Administrative Procedures" for a range of social service providers, establishes a regulatory scheme that governs Maxim's conduct as a home health agency.[15] But Maxim has not established the exemption provision's second prong, that the regulations governing home health agencies prohibit the specific conduct at issue. Although the regulations require home health agencies to adopt a set of policies and procedures, they do not explicitly require home health agencies to comply with these policies and procedures.[16] And Maxim provided no evidence at trial or in briefing to show that the Department of Health and Social Services interprets or enforces the regulations as if they impose such an obligation. As a result Maxim has not established that the regulations governing home health agencies prohibit noncompliance with a home health agency's own procedures.[17]
It is also ambiguous whether the regulations promulgated under AS 47.32.010 - .900 prohibit Maxim's misrepresentation to Collens about the reason for his discharge. The regulations state that "[a] patient receiving home health services has the right to ... be informed of the reason for impending discharge."[18] Admittedly a right to information is not worth much if the information is not accurate. But it is not clear that the regulations' statement of this right translates, in practice, to a prohibition on misrepresentations such as Maxim's. The regulations' emphasis on the existence of policies and procedures, rather than compliance with them , suggests that the Department focuses enforcement on home health agencies' adoption of procedures and policies that are generally protective of patients' rights. Whether the Department devotes enforcement resources to policing individual acts of misrepresentation is uncertain. Absent evidence that the Department does so, Maxim has not met its burden of proving the statutory exemption provision's second prong. Maxim's conduct is not exempt from UTPA liability under AS 45.50.481(a)(1).
3. We decline to adopt the "entrepreneurial aspect" rule on the facts of this case; regardless, it would not exempt Maxim's conduct.
Maxim also argues that there is a general healthcare exemption from the UTPA. It contends that health professionals should be subject to the UTPA only for conduct related to the business or "entrepreneurial" aspects of the health profession - not conduct involving the provision of medical care. But we are not convinced that we should adopt this proposed common law exclusion on the facts of this case.
*197 Other jurisdictions have limited the scope of consumer protection laws as applied to the so-called "learned professions," such as law and medicine.[19] Such jurisdictions generally conclude that state consumer protection laws may apply to medical and legal professionals when the "entrepreneurial" or "business" aspects of these professionals' services are implicated.[20] But if a claim raises questions about a professional's competence, the professional is exempt from liability under the state consumer protection law.[21] Courts that adopt such an "entrepreneurial aspect" rule reason that "[t]o hold otherwise would transform every claim for ... malpractice into a [consumer protection act] claim."[22]
We have previously applied the UTPA to professional misconduct in the legal profession and to claims involving the medical industry.[23] In those cases we saw no need to apply or delineate the scope of a professional services exemption to the UTPA. Under the right circumstances, it may be appropriate to exempt some conduct of the learned professions from UTPA liability. But those circumstances are not present here. The only medical professional involved in the decision to discharge Collens advised Maxim that the discharge was not warranted for medical reasons - Collens's discharge was unquestionably a business decision. Thus even if we were to adopt an "entrepreneurial aspect" exception for the UTPA's application to certain professional services, Maxim would still be liable under the Act. The superior court did not err by concluding that Maxim could be liable under the facts of this case.
B. The Superior Court's Attorney's Fee Award Was Unreasonable.
The superior court awarded Collens attorney's fees in accordance with Alaska Civil Rule 82(b)(1) for his successful IIED and punitive damage claims. It then determined attorney's fees for Collens's UTPA claim per AS 45.50.537(a), which states that a prevailing private plaintiff in an UTPA action "shall be awarded costs as provided by court rule and full reasonable attorney fees at the prevailing reasonable rate." The superior court noted that we have not yet decided whether "full reasonable attorney fees" under this provision can mean attorney's fees as defined by the prevailing party's contingency fee agreement. The court concluded that defining attorney's fees in this way was consistent with the statute, so long as the contingency fee agreement in question was reasonable.
The superior court found that the 45% contingency fee in the agreement between Collens and his counsel was not a prevailing reasonable rate. The court adjusted this down to a 40% contingency rate and used that to calculate the attorney's fees for Collens's UTPA damages award. The court acknowledged that the resulting award was nearly four times the award under Rule 82 proposed by Maxim,[24] but concluded that the award was reasonable given the case's complexity and the effort and quality of Collens's counsel's work.
Maxim challenges the superior court's construction of AS 45.50.537(a), namely its conclusion that "full reasonable attorney fees" can be based on a contingency fee *198 agreement, rather than a calculation of the reasonable hours worked multiplied by a reasonable hourly rate. We review the superior court's statutory construction de novo,[25] considering the statute's language, legislative history, and legislative purpose.[26] Ultimately we reject its interpretation of the statute.
The UTPA's current attorney's fee language was adopted through a 1998 amendment.[27] The committee minutes related to the amendment indicate that its drafters hoped to enhance UTPA enforcement by encouraging private litigation under the Act.[28] The phrase "full reasonable attorney fees at the prevailing reasonable rate" was specifically intended to ensure that attorney's fees for prevailing plaintiffs would not be capped by Rule 82.[29] Some legislators also suggested that the provision was inspired by similar fee-shifting provisions in civil rights statutes.[30]
The fee-shifting provision's legislative history indicates the intent to encourage private lawsuits by providing more generous attorney's fee awards than those available under Rule 82. But the legislative history does not indicate how legislators intended courts to calculate "full reasonable attorney fees" under the statute. For guidance we look to federal interpretation of the fee-shifting provisions in the Clayton Act and civil rights statutes. The Clayton Act, like the UTPA, is a consumer protection act providing a private right of action, and its fee-shifting provision's language is similar to the UTPA's.[31] Federal courts acknowledge that rules guiding interpretation of attorney's fee provisions in civil rights statutes apply to their interpretation of "reasonable attorney's fee" under the Clayton Act.[32] Moreover the legislative history of the UTPA's fee-shifting *199 provision indicates it was at least partly inspired by those of civil rights statutes. We also look to how courts in other jurisdictions have interpreted fee-shifting provisions in similar consumer protection acts. After reviewing these persuasive authorities, we conclude that the superior court's calculation of Collens's attorney's fee award deviates from the norm likely intended by the statute.
Courts calculating reasonable attorney's fees under similar fee-shifting provisions generally employ what we have called the "modified lodestar" method.[33] Trial courts following this approach first calculate a baseline attorney's fee award by determining the reasonable number of hours the attorney worked and multiplying that by a reasonable hourly rate.[34] Courts then have the discretion to adjust this baseline "lodestar" amount to arrive at the final fee award.[35] They may consider a variety of factors in calculating the lodestar and deciding whether to adjust it, including what we have called the Johnson - Kerr factors:
(1) The time and labor required. ...
(2) The novelty and difficulty of the questions involved. ...
(3) The skill requisite to perform the legal service properly. ...
(4) The preclusion of other employment by the attorney due to acceptance of the case. ...
(5) The customary fee. ...
(6) Whether the fee is fixed or contingent. ...
(7) Time limitations imposed by the client or the circumstances. ...
(8) The amount involved and the results obtained. ...
(9) The experience, reputation, and ability of the attorneys. ...
(10) The "undesirability" of the case. ...
(11) The nature and length of the professional relationship with the client. ...
(12) Awards in similar cases.[36 ]
Unlike the superior court's approach, the modified lodestar method does not invite a situation in which fees could vary widely depending on the plaintiff's recovery. We are convinced that Alaska courts should employ it when determining "full reasonable attorney fees" under the UTPA's fee-shifting provision. We note, however, that the modified lodestar approach we adopt today differs from that favored by the United States Supreme Court. The U.S. Supreme Court has "held that an enhancement [in the second step of the modified lodestar calculation] may not be awarded based on a factor that is subsumed in the lodestar calculation."[37] And *200 some of the Court's decisions strongly suggest that certain factors, including whether an attorney's fee is fixed or contingent, are inherent to the considerations necessary for a lodestar determination and thus may never serve as grounds for decrease or enhancement in the second step of the modified lodestar calculation.[38]
But the U.S. Supreme Court's interpretation of fee-shifting provisions in federal statutes is not binding on our interpretation of the UTPA's fee-shifting provision. And like other jurisdictions that have sought guidance in federal jurisprudence when interpreting fee-shifting provisions in their own state statutes, we are not entirely persuaded by the Court's reasoning in this area.[39] For one, we agree with the courts of other jurisdictions, and the dissenting opinions of key U.S. Supreme Court cases, that a contingency enhancement in the second step of the lodestar determination can provide a "risk premium" necessary to induce competent counsel to litigate claims when payment for legal services is contingent on success in the case.[40] We thus leave it within the trial court's discretion to consider the contingent nature of a fee agreement when calculating an attorney's fee award under the modified lodestar approach, and to incorporate considerations about this factor into either the first or second step of the modified lodestar calculation.[41]
Here the superior court erred in its assessment of full reasonable attorney's fees. It did not complete the first step in a modified lodestar determination: calculating a baseline award based on an approximation of hours reasonably worked multiplied by a reasonable hourly rate. We reverse the superior court's attorney's fee award and remand for an award based on a reasonable rate for the services, as calculated using the modified lodestar method outlined above. We note that the Johnson - Kerr factors are similar to the factors we apply to determine reasonable attorney's fees in other situations using Alaska Rule of Professional Conduct 1.5(a) and Alaska Bar Rule 35(a).[42] The trial court may *201 draw on its experience with these factors when determining how to calculate a baseline reasonable rate award and whether to enhance or decrease that baseline amount.
C. We Affirm The Superior Court's Decision In All Other Respects.
1. It was not an abuse of discretion to preclude Maxim from presenting expert testimony on damages at trial, and Maxim failed to preserve this as an issue for appeal.
Maxim retained two expert witnesses - one to testify about Collens's "claimed economic damages" and another to testify about his "medical treatment and costs" - but did not disclose their reports before the deadline set by the superior court. The court eventually issued an order precluding Maxim's experts from testifying at trial. Maxim claims this was an abuse of discretion, but we do not agree.
As a threshold matter, Maxim did not preserve this issue because it never filed the expert reports. Under Alaska Evidence Rule 103, error may not be predicated on a ruling that excludes evidence unless "the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked."[43] Under the Rule, "a party ordinarily 'waives its right to challenge the exclusion of evidence unless an offer of proof as to the substance of the evidence is made at the time the evidence is excluded.' "[44] The purpose of the offer of proof requirement is to "resolve doubts as to what testimony the witness would have in fact given."[45] Maxim's January 2017 expert disclosure does not serve as an offer of proof because without the substance of the proposed experts' testimony, it is impossible to determine whether Maxim suffered any prejudice by its exclusion. By failing to file expert reports with the superior court, Maxim waived this claim of error.
Even if Maxim had not waived the issue, we would affirm the superior court's preclusion orders, for they were not an abuse of discretion. Alaska Civil Rule 26(a)(2) mandates timely disclosure of expert witness reports. Alaska Civil Rules 16(f) and 37(c)(1) authorize the imposition of sanctions if a party fails to disclose required information or fails to obey a pretrial order. Rule 37(c)(1) makes exclusion of testimony the presumptive rule when evidence is not disclosed as required:
A party that without substantial justification fails to disclose information required by Rule[ ] 26(a) ... shall not, unless such failure is harmless, be permitted to use as evidence at a trial ... any witness or information not so disclosed. In addition to or in lieu of this sanction, the court, on motion and after affording an opportunity to be heard, may impose other appropriate sanctions.
Trial courts generally have discretion to determine the appropriate sanction for the violation of a discovery order, but this discretion is limited when the sanction's effect "is to impose liability on the offending party, establish the outcome of or preclude evidence on a central issue, or end the litigation entirely."[46] Here, precluding Maxim's expert witness testimony did not entirely eliminate evidence on a central issue - Maxim was free to interrogate Collens's expert witnesses *202 through cross-examination after they presented evidence on damages.[47] In reviewing the superior court's discovery sanction for abuse of discretion, we therefore grant it the wide latitude generally afforded trial courts in these situations.
Under Civil Rule 37(c)(1), the trial court must generally exclude undisclosed evidence unless there is substantial justification for the party's failure to make timely disclosure and this failure is harmless. Here, Maxim's justification for the delay was disputed by Collens, and weighing the parties' conflicting accounts against one another, the court reasonably determined that Maxim's delay was unjustified. Maxim's failure to produce expert reports was not harmless since, absent the sanction, it would have unacceptably delayed an already oft-postponed trial. The superior court's application of Rule 37(c)(1) was not an abuse of discretion.
2. The damages award was not excessive.
Maxim raises multiple objections to the damages award. We address only those arguments that merit discussion and affirm the superior court's award on all counts.
First the court's compensatory damages for breach of contract were not excessive. Trial evidence established that Collens's medical condition is permanent and that he will need full-time nursing care for his lifetime. The superior court calculated Collens's breach of contract damages as the value of nursing care Maxim promised but failed to provide; the past and future value of services Collens lost when he was discharged from Maxim and forced to move to Washington state, where he was not eligible for these services; and Collens's past and future out-of-pocket costs resulting from his discharge and subsequent move to Washington.
We review a trial court's assessment of compensatory damages for clear error,[48] upholding the award as long as the trial judge "follows the correct rules of law, and [the] estimation appears reasonable and is grounded upon the evidence."[49] Collens's plan of care might vary over his lifetime, but nothing in the record suggests that such variations would create meaningful deviations from the court's estimated damages. And no evidence establishes how to calculate and deduct from the estimated damages the impact of other factors that Maxim alleges the court failed to consider. The superior court's compensatory damages for breach of contract are not clearly erroneous.
Second damages for Collens's IIED claim were appropriate. Maxim challenges the $400,000 in IIED damages, apparently on grounds that it was error for the superior court to find that Collens suffered severe distress.[50] We have defined severe emotional distress as "distress of such substantial quality or enduring quantity that no reasonable person in a civilized society should be expected to endure it."[51] "In some cases, the circumstances surrounding a claim may be sufficient to persuade a jury that the plaintiff has actually suffered serious emotional trauma."[52] The symptoms Collens described experiencing after learning of his premature discharge, corroborated by testimony from his mother, doctor, and care coordinator, support the superior court's finding *203 that his emotional distress was severe, as do the circumstances of this stress. Based on this record, it was not clear error for the superior court to conclude that these elements of the tort were established.[53] Compensatory damages for IIED were warranted.
Third the superior court's award of punitive damages was not erroneous. To recover punitive damages, a plaintiff must establish that
the wrongdoer's conduct was outrageous, such as acts done with malice or bad motives or a reckless indifference to the interests of another. Actual malice need not be proved. Rather, [r]eckless indifference to the rights of others, and conscious action in deliberate disregard of them ... may provide the necessary state of mind to justify punitive damages.[54 ]
A trial court's determination that punitive damages are warranted must be supported by clear and convincing evidence.[55]
The record provides ample support for the superior court's finding that Maxim committed outrageous conduct demonstrating reckless indifference to Collens's health and safety. Adkins admitted that she delivered Collens's discharge letter without first speaking to his physician, that at the time of delivery she knew his care coordinator did not consent to discharge, and that she knew of no alternative care providers for Collens. Given these admissions, Collens's discharge demonstrated disregard for critical health professionals' care assessments and recklessness as to Collens's future health. We affirm the punitive damages award.[56]
Finally Collens was not required to elect his remedies as between punitive and treble damages. "[E]lection of remedies is the choice by a party to an action of one of two or more coexisting remedies or rights or theories of recovery[ ] arising out of the same facts."[57]
Some jurisdictions implement election of remedies as a common law doctrine and require plaintiffs to choose one of multiple potential remedies when those remedies are "so inconsistent or repugnant that pursuit of one necessarily involves negation of the other."[58] In those jurisdictions plaintiffs who could claim both punitive damages and consumer protection act treble damages for a single claim may be required to choose between the two remedies.[59] Courts in such jurisdictions reason that permitting receipt of both would allow "impermissible double recovery because the two forms of enhanced damages serve the same functions."[60] Whether to adopt the election-of-remedies doctrine is a question of law to which we apply our independent judgment.[61]
*204 We have not previously applied the election of remedies doctrine in a context such as this one. But in Kenai Chrysler Center, Inc. v. Denison , we were asked to determine whether UTPA treble damages are a form of punitive damages such that a plaintiff waiving his claim for punitive damages also waives his right to treble damages under the Act.[62] We held that the UTPA authorizes individuals suing for treble damages under the Act to also pursue "common law relief such as punitive damages."[63] And we noted that the UTPA's treble damages provision serves "important purposes" that punitive damages do not.[64] Given our precedent it was not error for the superior court to conclude that Collens could claim both punitive and treble damages for the same conduct.[65] Our statements in Kenai indicate that the rationale behind the common law election of remedies doctrine - to avoid double recovery - does not apply here. We decline Maxim's invitation to read the doctrine into the statute.
IV. CONCLUSION
We REVERSE the superior court's attorney's fee award and REMAND for an award consistent with this opinion. We AFFIRM the superior court's judgment on all other issues.

The UTPA is codified at AS 45.50.471 -.561.

See 7 Alaska Administrative Code (AAC) 12.507(b)(3) (2015) (requiring home health agencies to adopt written policies and procedures).

Maxim spoke with Collens's care coordinator prior to delivering the discharge letter but did not speak to his physician. Both sent letters to Maxim several days after Collens's discharge disagreeing with the decision.

Collens also sued Adkins individually. For convenience, we refer to the two defendants collectively as "Maxim."

Maxim also briefly argues that Collens failed to prove his claim under AS 45.50.471(b)(12), the particular subsection of the UTPA cited in his trial brief. But the superior court concluded that Maxim was liable under different provisions of the Act - AS 45.50.471(a) and AS 45.50.471(b)(14) - and Maxim does not challenge that conclusion. Thus we do not address Maxim's liability under AS 45.50.471(b)(12).

AS 45.50.481(a)(1) provides that the UTPA does not apply to "an act or transaction regulated by a statute or regulation administered by the state."

The Alaska State Medical Association joined in this argument as amicus curiae.

Mitchell v. Mitchell , 370 P.3d 1070, 1076 (Alaska 2016).

See Wells v. Barile , 358 P.3d 583, 589 n.17 (Alaska 2015).

See Zeman v. Lufthansa German Airlines , 699 P.2d 1274, 1280 (Alaska 1985) (stating that appellants "can expand or refine details of an argument otherwise preserved on appeal").

See Kenai Chrysler Ctr., Inc. v. Denison , 167 P.3d 1240, 1255 n.37 (Alaska 2007) ("Interpretation of the UTPA presents a question of law that we review independently."). Under this standard of review, we "adopt the rule of law that is most persuasive in light of precedent, reason, and policy." City of Fairbanks v. Amoco Chem. Co. , 952 P.2d 1173, 1176 (Alaska 1998).

Matanuska Maid, Inc. v. State , 620 P.2d 182, 186 (Alaska 1980).

State v. O'Neill Investigations, Inc. , 609 P.2d 520, 528 (Alaska 1980).

See Alaska Interstate Constr., LLC v. Pac. Diversified Invs., Inc. , 279 P.3d 1156, 1167 (Alaska 2012) ("PDI did not meet its burden of showing the UTPA exemption was applicable to AIC's claims because it did not establish that the Federal Aviation Administration (FAA) specifically regulates the fraudulent conduct AIC alleged in connection with its aircraft leases.").

See also 7 AAC 12.500 -.590 (regulations governing home health agencies). Amicus curiae Alaska State Medical Association argues that Maxim's conduct is regulated by AS 09.55.530 -.560, the Article governing medical malpractice actions. But these statutory provisions do not provide for the sort of ongoing, careful regulation this court has held is necessary to satisfy prong one of the statutory exemption. See Matanuska Maid , 620 P.2d at 186 (holding existence of statute simply prohibiting conduct not enough to consider conduct "regulated" by statutory scheme). Moreover, while these statutes govern how medical malpractice claims may be brought, they do not themselves prohibit or regulate the specific conduct at issue.

See 7 AAC 12.507(b)(3) (requiring home health agencies to "adopt written by-laws, policies, and procedures"); 7 AAC 12.531(a) ("A home health agency shall establish, implement, and make available to all personnel, written policies and procedures appropriate to the services offered by the agency. These policies and procedures must be reviewed at least annually and revised as necessary."); 7 AAC 12.531(b)(2) ("A home health agency shall establish policies and procedures covering ... conditions for acceptance, transfer, discharge, and continuing care of patients."); 7 AAC 12.600(f) ("A home health agency must comply with 7 AAC 12.5007 AAC 12.590.").

See Alaska Interstate , 279 P.3d at 1167-68 (holding defendant did not prove the UTPA exemption's second prong because defendant's specific conduct was not regulated by regulations' terms and expert trial testimony had not established FAA regulated it in practice).

7 AAC 12.534(b)(10).

See, e.g. , Haynes v. Yale-New Haven Hosp. , 243 Conn. 17, 699 A.2d 964, 972-74 (1997) ; Short v. Demopolis , 103 Wash.2d 52, 691 P.2d 163, 168 (1984). See generally Brookins v. Mote , 367 Mont. 193, 292 P.3d 347, 358-60 (2012) (cataloging approach of other states before holding Montana's consumer protection law applied only to the "entrepreneurial, commercial, or business aspects of running a hospital").

See, e.g. , Haynes , 699 A.2d at 974.

See, e.g. , id.

See id. ; see also Brookins , 292 P.3d at 359 ("[F]ailing to exempt professional negligence in the course of the 'actual practice' of medicine could render medical malpractice law 'obsolete.' " (quoting Nelson v. Ho , 222 Mich.App. 74, 564 N.W.2d 482, 486 (1997) )).

See Jones v. Westbrook , 379 P.3d 963, 969-71 (Alaska 2016) (resolving statute of limitations dispute for UTPA claims against attorney); Pepper v. Routh Crabtree, APC , 219 P.3d 1017, 1025 (Alaska 2009) (holding lawyers liable under the UTPA for debt collection misconduct); Smallwood v. Cent. Peninsula Gen. Hosp. , 151 P.3d 319, 329 (Alaska 2006) (holding claim regarding hospital's billing practices covered by the UTPA); Odom v. Fairbanks Mem'l Hosp. , 999 P.2d 123, 131-32 (Alaska 2000) (allowing UTPA claims related to alleged coercive trade practices by hospital to go forward).

$5,676,668.17 compared to $1,492,950.40.

Michael W. v. Brown , 433 P.3d 1105, 1109 (Alaska 2018).

City of Valdez v. State , 372 P.3d 240, 248 (Alaska 2016).

Ch. 96, § 5, SLA 1998.

See Minutes, H. Labor & Commerce Standing Comm. Hearing on H.B. 203, 20th Leg., 1st Sess. No. 1513 (Apr. 23, 1997) (comments of Rep. Dyson); id. at No. 1889 (testimony of Daveed Schwartz, Assistant Att'y Gen.); Minutes, H. Judiciary Standing Comm. Hearing on H.B. 203, 20th Leg., 2d Sess. No. 0763 (Feb. 9, 1998) (comments of Rep. Dyson that "the problem has been with 'the small guy going after Goliath' "); id. at No. 0847 (comments of Chairman Green "that a transaction for a $2,000 car ... could quickly go beyond $5,000 just in time, motions, and that sort of thing").

For committee testimony comparing Rule 82 awards to the more generous award expected under the amended attorney's fee provision's new language, see Minutes, H. Labor & Commerce Standing Comm. Hearing on H.B. 203, 20th Leg., 1st Sess. No. 2146 (Apr. 23, 1997) (testimony of Daveed Schwartz, Assistant Att'y Gen.) and Minutes, H. Judiciary Standing Comm. Hearing on H.B. 203, 20th Leg., 2d Sess., No. 0006 (Feb. 9, 1998) (comments of Rep. Croft).
Rule 82 establishes several context-dependent schedules for attorney's fees. In cases where the prevailing party recovers no money judgment, the Rule requires the court to award a certain percentage of the prevailing party's "reasonable actual attorney's fees" depending on whether the case went to trial. Alaska R. Civ. P. 82(b)(2). We have held that since "[t]he purpose of Civil Rule 82 is to compensate partially a prevailing party[,] ... full attorney's fees are never awarded absent 'justification' and consideration of the 'good faith' nature of the unsuccessful party's claim or defense." Heritage v. Pioneer Brokerage &Sales, Inc. , 604 P.2d 1059, 1065-66 (Alaska 1979) (quoting Malvo v. J.C. Penney Co. , 512 P.2d 575, 587 (Alaska 1973) ).

Representative Dyson, for example, noted that the proposed legislation "follows a practice learned during the civil rights era, when most people realized that state attorney general's offices didn't have the resources, or perhaps the inclination, to file ... civil rights actions .... So, they allowed for, if you were successful in an action, that you could recover your attorney['] s fees and, therefore, the cost of bringing the action." Minutes, H. Judiciary Standing Comm. Hearing on H.B. 203, 20th Leg., 2d Sess. No. 0577 (Feb. 9, 1998).

See 15 U.S.C. § 15(a) (2012) ("[A]ny person ... injured ... by reason of anything forbidden in the antitrust laws may sue therefor ... and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.").

See, e.g. , Copper Liquor, Inc. v. Adolph Coors Co. , 624 F.2d 575, 581 (5th Cir. 1980) (citing Johnson v. Ga. Highway Express, Inc. , 488 F.2d 714 (5th Cir. 1974) (adopting 12 factors used to determine reasonable attorney's fees in employment discrimination law for attorney's fees disputes under Clayton Act), abrogated on other grounds by City of Burlington v. Dague , 505 U.S. 557, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992) ).

See State, Dep't of Health & Soc. Servs. v. Okuley , 214 P.3d 247, 253 (Alaska 2009) (describing modified lodestar method); see also Hensley v. Eckerhart , 461 U.S. 424, 433-34, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) (applying modified lodestar method to fee shifting under Civil Rights Attorney's Fee Awards Act of 1976); Advanced Constr. Corp. v. Pilecki , 901 A.2d 189, 199 (Me. 2006) (stating that "when analyzing entitlement to attorney fees pursuant to Maine consumer protection statutes ... the methods of analysis courts use in cases involving the federal civil rights attorney fee provision ... are appropriate"); Furst v. Einstein Moomjy, Inc. , 182 N.J. 1, 860 A.2d 435, 446-48 (2004) (affirming modified lodestar approach to fee-shifting provision in New Jersey's consumer protection statute).

See, e.g. , Hensley , 461 U.S. at 433, 103 S.Ct. 1933 ("The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate."); see also Okuley , 214 P.3d at 253 ("[A] court following the modified lodestar method first 'determines the number of hours an attorney reasonably spent on the case and multiplies that number by a reasonable hourly rate.' " (quoting Edwards v. Alaska Pulp Corp. , 920 P.2d 751, 757 (Alaska 1996) )).

See Okuley , 214 P.3d at 253 ; see also Hensley , 461 U.S. at 434, 103 S.Ct. 1933 ("The product of reasonable hours times a reasonable rate does not end the inquiry. There remain other considerations that may lead the district court to adjust the fee upward or downward, including the important factor of the 'results obtained.' "); Furst , 860 A.2d at 447-48 (describing considerations trial court should make when determining whether to adjust lodestar amount).

Johnson , 488 F.2d at 717-19 ; see also Kerr v. Screen Extras Guild, Inc. , 526 F.2d 67, 70 (9th Cir. 1975) (adopting these factors); Okuley , 214 P.3d at 251 n.13 (labeling these the "Johnson - Kerr factors").

Perdue v. Kenny A. ex rel. Winn , 559 U.S. 542, 553, 130 S.Ct. 1662, 176 L.Ed.2d 494 (2010).

See City of Burlington v. Dague , 505 U.S. 557, 562, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992) ("We note at the outset that an enhancement for contingency would likely duplicate in substantial part factors already subsumed in the lodestar."); Pennsylvania v. Del. Valley Citizens' Council for Clean Air , 483 U.S. 711, 726, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987) ("[I]t may well be that using a contingency enhancement is superfluous and unnecessary under the lodestar approach to setting a fee."); Blum v. Stenson , 465 U.S. 886, 898-901, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984) (holding that complexity of litigation, novelty of issues, high quality of representation, and benefit to class were factors subsumed in lodestar calculation and thus insufficient justification for enhancement of lodestar).

See, e.g. , Schefke v. Reliable Collection Agency, Ltd. , 32 P.3d 52, 94, 96 (Haw. 2001) (concluding that Dague 's and Delaware Valley 's dissenting opinions are better reasoned than Dague 's majority opinion and therefore holding that contingency enhancements of a lodestar are permissible); Rendine v. Pantzer , 141 N.J. 292, 661 A.2d 1202, 1228 (1995) (holding that despite U.S. Supreme Court jurisprudence to the contrary, trial courts should consider whether contingency enhancements to a lodestar award will result in a more reasonable attorney's fee).

See Del. Valley , 483 U.S. at 735-36, 107 S.Ct. 3078 (Blackmun, J., dissenting); Ketchum v. Moses , 24 Cal.4th 1122, 104 Cal.Rptr.2d 377, 17 P.3d 735, 744 (2001) ; Joyce v. Federated Nat'l Ins. Co. , 228 So. 3d 1122, 1130, 1132-33 (Fla. 2017) ; Schefke , 32 P.3d at 96-97 ; Rendine , 661 A.2d at 1227-28 ; see also Blum , 465 U.S. at 903, 104 S.Ct. 1541 (Brennan, J., concurring) (stating that permitting lodestar enhancements to "compensate for the contingent nature of success, and thus for the risk of nonpayment in a particular case" is "entirely consistent with [a] market-based approach to hourly rates").

As for the other factor, the U.S. Supreme Court has indicated may be subsumed in the lodestar calculation, we need not determine at this time whether they must always be incorporated in the first step of the modified lodestar approach. However, we note our agreement with the statement in Hensley that trial courts considering the Johnson - Kerr factors "should note that many of these factors usually are subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate." 461 U.S. at 434 n.9, 103 S.Ct. 1933.

The factors are:
(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
(2) the likelihood[ ] that the acceptance of the particular employment will preclude other employment by the lawyer;
(3) the fee customarily charged in the locality for similar legal services;
(4) the amount involved and the results obtained;
(5) the time limitations imposed by the client or by the circumstances;
(6) the nature and length of the professional relationship with the client;
(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and
(8) whether the fee is fixed or contingent.
Alaska R. Prof. Conduct 1.5(a); see also Nautilus Marine Enters., Inc. v. Exxon Mobil Corp. , 332 P.3d 554, 558 n.18 (Alaska 2014) (noting that these factors are listed in "near-identical parallel" in Bar Rule 35(a) ).

Alaska R. Evid. 103(a)(2).

Mueller v. Buscemi , 230 P.3d 1153, 1155 (Alaska 2010) (quoting Agostinho v. Fairbanks Clinic P'ship , 821 P.2d 714, 717 (Alaska 1991) ).

Alaska R. Evid. 103 cmt. (quoting Fed. R. Evid. 103(b), Advisory Committee's Notes to 1972 proposed rules).

Khalsa v. Chose , 261 P.3d 367, 372 (Alaska 2011) (quoting Sykes v. Melba Creek Mining, Inc. , 952 P.2d 1164, 1169 (Alaska 1998) ). We review discovery sanctions for abuse of discretion. Id .

See Cartee v. Cartee , 239 P.3d 707, 719-20, 722 (Alaska 2010) (affirming the exclusion of expert witness testimony where the sanctioned party had an opportunity to challenge and critique the opposition's expert).

See Burton v. Fountainhead Dev., Inc. , 393 P.3d 387, 393 (Alaska 2017).

Pluid v. B.K. , 948 P.2d 981, 983 (Alaska 1997) (quoting Morrison v. State , 516 P.2d 402, 405 (Alaska 1973) ).

To prevail on an IIED claim, the plaintiff must show "(1) that the defendant's conduct was extreme and outrageous, (2) that the conduct was intentional or reckless, (3) that this conduct caused the plaintiff emotional distress, and (4) that the distress was severe." Cameron v. Beard , 864 P.2d 538, 548 (Alaska 1993). Maxim also contends that the statutory cap on non-economic damages in medical malpractice actions should apply here. See AS 09.55.549. But this is not a medical malpractice action.

State v. Carpenter , 171 P.3d 41, 59 (Alaska 2007) (quoting Fyffe v. Wright , 93 P.3d 444, 456 (Alaska 2004) ).

Chizmar v. Mackie , 896 P.2d 196, 205 (Alaska 1995).

"We review the superior court's factual findings for clear error, which occurs when a review of the entire record leaves us with a definite and firm conviction that a mistake has been made." See Offshore Sys.-Kenai v. State, Dep't of Transp. & Pub. Facilities , 282 P.3d 348, 354 (Alaska 2012).

Cummings v. Sea Lion Corp. , 924 P.2d 1011, 1022 (Alaska 1996) (alteration and omission in original) (quoting Barber v. Nat'l Bank of Alaska , 815 P.2d 857, 864 (Alaska 1991) ).

Brandner v. Hudson , 171 P.3d 83, 89 (Alaska 2007) ; see also AS 09.17.020. " 'Clear and convincing' evidence is evidence establishing that something is 'highly probable.' " In re Reinstatement of Wiederholt , 89 P.3d 771, 772 n.6 (Alaska 2004) (quoting Denuptiis v. Unocal Corp. , 63 P.3d 272, 275 n.3 (Alaska 2003) ).

Maxim also argues that the superior court's punitive damages award should be reversed because the court never held a separate proceeding to determine the punitive damages amount, as required by AS 09.17.020. But Maxim failed to object to this error in either of its post-trial motions responsive to the superior court's findings of fact and conclusions of law. Failing to contemporaneously object to the superior court's procedural error waives the issue for appeal. See Berry v. Berry , 277 P.3d 771, 775 (Alaska 2012).

28A C.J.S. Election of Remedies § 1, Westlaw (database updated Mar. 2019).

E.g. , Miller v. United Automax , 166 S.W.3d 692, 696-97 (Tenn. 2005) (quoting Forbes v. Wilson Cty. Emergency Dist. 911 Bd. , 966 S.W.2d 417, 421 (Tenn. 1998) ).

Id. at 697.

Id. (quoting Concrete Spaces, Inc. v. Sender , 2 S.W.3d 901, 906 (Tenn. 1999) ).

See Mat-Su Valley Med. Ctr., LLC v. Advanced Pain Ctrs. of Alaska, Inc. , 218 P.3d 698, 700 (Alaska 2009) ; Beal v. McGuire , 216 P.3d 1154, 1162 (Alaska 2009).

167 P.3d 1240, 1259 (Alaska 2007).

Id. at 1260.

Id.

Collens argues that the damages awards were for different conduct. But the superior court identified Maxim's UTPA violations as the false promises made in their Patients' Rights document and their deceptive discharge of Collens. The discharge was the basis for Maxim's IIED liability, and the false promises are the conduct the court identified as misrepresentation. Even though the punitive damages flow from the IIED and misrepresentation claims, they were awarded for the same conduct as the UTPA treble damages, contrary to the superior court's statement otherwise.